**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

MIKECO DESIR,                                          CASE NO.: 23-CV-60499-AHS

o/b/o of Kevin Desir, Deceased,

                Plaintiff,                                Jury Trial Demanded

v.

SHERIFF GREGORY TONY, in his official and
individual capacity; RYAN DANIEL, in his
individual capacity; ANGELA MCNEAL, in her
individual capacity; KIMBERLY GREEN, in her
individual capacity; CHRISTOPHER WILLIAMS,
in his individual capacity; DEVON PARKER, in his
individual capacity; JEREMIAH HOWARD, in his
individual capacity; WELLPATH LLC, a foreign
limited liability company registered and doing
business in Florida; WELLPATH
MANAGEMENT, INC., a foreign profit
corporation registered and doing business in
Florida; ETUDE PETIT-HOMME DATUS in her
individual capacity; JANE DOES #1-3, in their
individual capacities.

                Defendants.

_____/

## **AMENDED COMPLAINT**

Plaintiff Mikeco Desir, on behalf of his deceased brother Kevin Desir, by and through the

undersigned counsel, hereby sues Sheriff Gregory Tony, Ryan Daniel, Angela McNeal, Kimberly

Green, Christopher Williams, Devon Parker, Jeremiah Howard, Wellpath LLC, Wellpath

Management Inc., Etude Petit-Homme Datus, and Jane Does #1-3 (collectively, "Defendants"),

and alleges as follows:

1

## INTRODUCTION

Kevin Desir was a father to two young girls, a brother, a son, and a man who deserved to live. Despite Kevin's mental health diagnosis, Kevin was a productive member of society who many people looked up to and respected. With proper care and treatment, Kevin functioned well. In January of 2021, Kevin was arrested for possessing marijuana. An arrest that placed him in Broward's care, custody, and control. However, it took a matter of four days, in the jail's custody, for Kevin's condition to deteriorate and then for the staff to kill him. The staff at Broward County's North Broward Bureau Jail failed to provide adequate care for Kevin. The failures of the Broward County Sheriff's Office and Wellpath caused Kevin's mental health to deteriorate and when Kevin had an episode, they killed him. Kevin's story is similar to that of many humans locked in Broward's cages. The jail staff have not been properly trained or supervised on how to deal with mental health and the result is often times deadly. Kevin's family files this suit to demand justice and accountability.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§§ 1331, 1343(a)(3), and 1367(a).

2. Venue is proper because the facts giving rise to Plaintiff's claims occurred within the Southern District of Florida. *See* 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff Mikeco Desir is a resident of the State of Florida and resides in Broward County, Florida. Plaintiff is the brother of Kevin Desir and has been appointed the legal representative of Kevin Desir's estate.

4. Defendant Sheriff Gregory Tony is, and was at all times relevant to this Complaint, the Sheriff of Broward County, Florida. As Sheriff of the Broward County Sheriff's Office ("BSO"), Defendant Tony has supervisory responsibility over all employees, staff, and agents, including medical personnel, at all of the Broward County jail facilities, including North Broward Bureau ("NBB"). On information and belief, Defendant Tony exercises control over the operations at the jail facilities, including over BSO's In Custody Behavioral Services Division ("ICBSD") and its mental health and program services, including, but not limited to, infirmary care, mental health infirmary care, crisis care, suicide watch, psychiatric observation, group treatment and programs, and individual treatment and programs.[1] Defendant Tony is responsible for ensuring that individuals in the Broward County jail facilities are provided with medical and mental health treatment and services and timely medical and hospital attention, especially in the context of medical and mental health emergencies, and are free from excessive force. Defendant Tony is also responsible for establishing and maintaining adequate policies and procedures, and training, supervising, and disciplining all employees, staff, and medical personnel at the jail facilities. He is sued in his official and individual capacities. Defendant Tony may be served at the Broward Sheriff's Office located at 2601 West Broward Boulevard, Fort Lauderdale, FL 33312.

5. Defendant Ryan Daniel was at all times relevant to this Complaint working in NBB, one of Broward County's jail facilities, as an employee or agent of BSO, acting

---

[1] *Carruthers v. Israel*, 76-cv-06086, ECF 1073-1, Mental Health Report – Status of Compliance with Settlement Agreement Terms - Kathryn A Burns MD, MPH (dated May 15, 2023), at 4-5.

within the scope of his employment or agency with BSO and under the color of state law.

6. Defendant Angela McNeal was at all times relevant to this Complaint working in NBB, one of Broward County's jail facilities, as an employee or agent of BSO, acting within the scope of her employment or agency with BSO and under the color of state law.

7. Defendant Kimberly Green was at all times relevant to this Complaint working in NBB, one of Broward County's jail facilities, as an employee or agent of BSO, acting within the scope of her employment or agency with BSO and under the color of state law.

8. Defendant Christopher Williams was at all times relevant to this Complaint working in NBB, one of Broward County's jail facilities, as an employee or agent of BSO, acting within the scope of his employment or agency with BSO and under the color of state law.

9. Defendant Devon Parker was at all times relevant to this Complaint working in NBB, one of Broward County's jail facilities, as an employee or agent of BSO, acting within the scope of his employment or agency with BSO and under the color of state law.

10. Defendant Jeremiah Howard was at all times relevant to this Complaint working in NBB, one of Broward County's jail facilities, as an employee or agent of BSO, acting within the scope of his employment or agency with BSO and under the color of state law.

11. Defendant Wellpath LLC, formerly known as Correct Care Solutions LLC, is a foreign limited liability company existing under the laws of the State of Delaware and registered to do business in the State of Florida. Defendant Wellpath LLC's principal address is 3340 Perimeter Hill Rd., Nashville, TN 37211, and it may be served upon its registered agent in Florida, Corporate Creations Network Inc., located at 801 US Highway 1, North Palm Beach, FL 33408.

12. Defendant Wellpath Management, Inc., formerly known as Correctional Medical Group Companies, Inc., is a foreign profit corporation existing under the laws of the State of Delaware and registered to do business in the State of Florida. Defendant Wellpath Management Inc.'s principal address is 3340 Perimeter Hill Rd., Nashville, TN 37211, and it may be served upon its registered agent in Florida, Corporate Creations Network Inc., located at 801 US Highway 1, North Palm Beach, FL 33408.

13. Defendants Wellpath LLC and Wellpath Management Inc. (collectively, "Wellpath Defendants"), on information and belief, are authorized pursuant to a contract with Broward County and/or BSO to administer medical and mental health treatment and services to inmates at Broward County's jail facilities. On information and belief, Wellpath Defendants staff the medical department at Broward County's jail facilities, including, but not limited to, the positions of mental health director, unit clerks, psychiatrists, nurse practitioners, physician assistant, registered nurses, and mental health professionals.[2] At all times relevant to this Complaint, Wellpath Defendants were responsible for the administration, supervision, and delivery of

---

[2] *Id.* at 4.

medical and mental health services and treatment at the Broward County jail facilities, including, but not limited to, infirmary care, mental health infirmary care, crisis care, suicide watch, psychiatric observation, group treatment and programs, and individual treatment and programs.[3]

14. Etude Petit-Homme Datus was at all times relevant to this Complaint an employee or agent of Wellpath Defendants and acting within the scope of her employment or agency with Wellpath.

15. Defendants Jane Does #1, #2, and #3 are individuals who were at all times relevant to this Complaint employees or agents of Wellpath Defendants and acting within the scope of their employment or agency with Wellpath.

## FACTUAL ALLEGATIONS

### *BSO's Custody of Kevin Desir*

16. Kevin Desir was taken into BSO custody on January 13, 2021. Kevin's admission history indicated that he had previously been housed in the facility, including in its mental health areas.

17. On January 13, Kevin completed a COVID-19 screening that indicated he had "no chronic health conditions." Kevin informed BSO staff during the intake process that he had a history of mental health issues.

18. On January 14, Kevin was transferred from Broward's Main Jail to NBB for psychological observation. NBB is "a minimum to medium-security, special needs detention facility" intended to "house and manage the mentally ill, medically infirm

---

[3] *Id.* at 5.

and special needs inmate population."[4] Notes from the jail's private medical provider, Wellpath, indicate that Kevin was placed in an isolation cell.

19. On January 14, Wellpath staff completed Kevin's health and psychiatric screenings.

20. The health screening indicated that Kevin did not have any existing heart conditions, no history of heart or lung conditions, and he was not taking any medications for any heart condition or seizures.

21. The psychiatric screening noted that Kevin was presently under mental health treatment, had received psychotropic medication (Risperdal) and treatment before, and had a history of outpatient mental health treatment, including as recently as three months prior to the screening.

22. Wellpath staff diagnosed Kevin with bipolar disorder and schizoaffective disorder. It was noted that Kevin was "openly anxious" and "uncooperative."

23. On January 15, Kevin was transferred to the Male Infirmary, per Wellpath's orders.

24. On January 15, it was noted that Kevin had an "altered thought process" and was not "receptive" but did not seem to be in "acute distress." However, a mental health nurse would need to "follow up" and Kevin was to be placed on psych observation.

25. On January 16, it was noted that Kevin was "nonverbal" and "not receptive" with an "altered thought process" and would need to be kept on psych observation.

26. On January 17, in the early afternoon, it was noted that Kevin was "alert and oriented" with "no sign of distress or discomfort" but that he was experiencing an "alteration in thought process" and would need to be monitored.

---

[4] North Broward Bureau, Broward County Sheriff's Office, available at https://www.sheriff.org/DOD/pages/jail-facilities/north-broward-bureau.aspx.

27. Wellpath staff notes over the course of these three days indicate that Kevin had not been eating meals, "refused" to be interviewed for a mental health assessment, and "appeared to be responding to internal stimuli." The notes also indicate that Wellpath staff "did not engage" Kevin on January 15 or January 17 but note that his condition was "worsening."

28. BSO staff similarly reported that Kevin "refused" medicine and meals from January 15 through January 17.

29. In accordance with Kevin's existing mental health treatment plan, which Wellpath staff learned about during his psychiatric screening on January 14, he should have been receiving treatment and medication for his mental health conditions.

30. On the night of January 17, another inmate in Kevin's pod, Jaimey Calveira Segarra, observed Kevin in severe distress in his cell, clearly having a mental health crisis. Kevin was fully naked, his cell was flooded with water, and he appeared to have cut himself. Mr. Segarra notified Defendant Daniel.

31. BSO's records indicate that Kevin's "thoughts were disorganized and unclear" during this time. After observing Kevin in his cell and talking to him at length, Defendant Daniel brought in additional BSO and Wellpath staff, notifying the Wellpath staff that Kevin was bleeding.

32. After additional BSO and Wellpath staff arrived, BSO's records indicate that BSO staff told Wellpath staff to "step aside" while they dressed Kevin. Wellpath notes indicate that blood was visible on Kevin's cell door.

33. BSO staff handcuffed Kevin at the front of his body through the slot in the cell door and opened the cell door. Defendant Howard grabbed Kevin's arm with one hand and grabbed the back of his neck with his other hand to remove him from the cell.

34. Once the cell door opened, Kevin appeared to try to pull away from BSO staff. In response, BSO staff used escalating force techniques against Kevin for the next four minutes.

35. During this time, no less than six BSO staff members used force on Kevin, dragging him across the pod's floor and pinning him down on his stomach with his hands above his head.

36. Defendant Green forcefully kneeled on Kevin's legs. She later stood up and stepped on Kevin's calf with her foot.

37. Defendant Williams stomped on Kevin's legs with his feet.

38. Defendant Daniel tased Kevin's upper back for no less than eight seconds, causing Kevin to temporarily stop moving. Following the initial tasing, Defendant Daniel tased Kevin several more times over the next minute or so.

39. Defendant Howard grabbed Kevin's head with both of his hands while other deputies continued to strike and pepper spray him.

40. Defendant McNeal sprayed Kevin in the face with pepper spray.

41. Defendant Howard punched Kevin in the face with a closed fist at least 10 times.

42. The Wellpath staff that had arrived earlier with the BSO staff—Defendant Datus and Jane Doe #1—remained on the other side of the pod. They did not approach Kevin after the assault ended despite (1) knowing that he was in distress in his cell

9

and bleeding before they arrived and (2) seeing him get hit, tasered, and pepper sprayed.

43. BSO staff then carried Kevin from the pod to another room with a restraint chair in it.

44. Kevin feebly attempted to stand and avoid the application of further force as the BSO staff placed him in the restraint chair.

45. Defendant Howard, standing behind Kevin as he was placed in the restraint chair, grabbed Kevin's neck below his chin, choking Kevin, while the other BSO staff members strapped Kevin into the restraint chair.

46. Before Kevin's legs were restrained–but after Kevin's arms were restrained–he continued to try to flail his legs, but he was too weak to make contact with any deputies.

47. Defendant McNeal pepper sprayed Kevin in the face at least twice. Kevin reacted to being sprayed in the face by moving around in the restraint chair.

48. BSO staff continued to strap Kevin down and Defendant Howard continued gripping Kevin's neck and did not let go until Kevin's body had gone fully limp.

49. Defendants Daniel, McNeal, Green, Williams, and Parker witnessed Defendant Howard gripping Kevin's neck for five minutes and knew that Kevin was fully restrained in the restraint chair for at least the last minute of Defendant Howard's chokehold. After Kevin was incapacitated, Defendants Daniel, McNeal, Green, Williams, and Parker simply stood around the restraint chair. None of them attempted to break Defendant Howard's grip around Kevin's neck or tried to otherwise intervene.

50. Jane Does #2 and #3 remained across the room from the restraint chair and went in and out of the nearby control room. They did not approach Kevin after he was restrained in the chair despite (1) seeing him get pepper sprayed in the face and (2) seeing him go limp in the restraint chair.

51. Over a minute after Kevin went limp, Defendant Williams checked Kevin's pulse for the first time.

52. Defendant Datus returned with additional Wellpath staff and checked Kevin's pulse. They waited at least another minute before checking Kevin's vitals. BSO and Wellpath notes indicate that Kevin was not responsive to verbal commands, his eyes were fixed, his pulse was not palpable, and his blood pressure could not be retained.

53. Defendant Williams replaced Defendant Howard and maintained his grip on Kevin's neck while Wellpath staff checked Kevin's vitals.

54. Kevin was left in the restraint chair for another three minutes before the deputies removed him from the chair and placed him on the floor. After placing Kevin on the floor, Wellpath staff, along with Defendant Williams, administered aid until EMTs arrived on the scene 10 minutes later.

55. Kevin remained unresponsive and in critical condition as he was transported to Broward Health North's emergency room. The hospital records indicate that when Kevin arrived at the emergency room, he had an altered mental status and he was unconscious. The records state that he was intubated in the emergency room.

56. While in Broward Health North's ICU, Kevin remained on a ventilator with an anoxic brain injury. The notes describe Kevin's condition from January 19 to

11

January 21 as "poorly unresponsive," "deeply comatose," "severely encephalopathic," and "decerebrating." Kevin also experienced multiple seizures during this time.

57. Kevin died 10 days after he was admitted to the hospital.

58. The Broward County Medical Examiner found that the cause of death and manner of death were "undetermined" but listed "loss of consciousness following restraint" and "hypoxic- anoxic encephalopathy" as final diagnoses.

59. A second autopsy conducted shortly thereafter found that the cause of death was "hypoxic encephalopathy" after Kevin was resuscitated following "cerebral asphyxia due to manual strangulation." The manner of death was found to be homicide as he died as a consequence of another person's direct compression of his neck. In other words, Kevin was strangled by Defendant Howard for over three minutes while strapped in the restraint chair.

60. Kevin suffered from various other injuries at the hands of BSO staff. Wellpath staff noted that Kevin had abrasions on his upper lip, lower lip, and right eyelid following the use of force incident. The Broward County Medical Examiner found that Kevin suffered from injuries to his head, face, torso, back, and buttocks. A pathologist found that Kevin suffered from injuries to his head, face, neck, torso, and arms, including puncture wounds from the use of a taser.

*BSO and Supervisory Defendant Tony's Policy and Practice of Excessive Force*

61. The use of force by a law enforcement officer is unreasonable if it is not necessary to protect the officer or subdue the detainee. Even in the limited circumstances under which force is permitted, it cannot exceed a level of force equal to the individual's level of resistance.

62. Law enforcement officers have an obligation to stop using force after an individual has been brought into compliance or the situation is under control.

63. If an individual seemingly needs to be removed from their cell, law enforcement officers should consider defusing the situation in other ways before engaging in a cell extraction. If an extraction is deemed necessary, officers must be properly trained and closely supervised.

64. If an individual is being restrained on the ground, law enforcement officers should position them in a manner that will assist breathing and minimize respiratory issues, such as placing them on their side. Officers should avoid putting pressure on the individual's chest, neck, or head. Individuals should not be placed in the prone position (i.e., face down) because of the significant risk of asphyxia. Applying weight to an individual's back results in additional compression that can increase difficulty breathing.

65. Pepper spray should not be used against an individual who is handcuffed or otherwise restrained unless the person continues to pose an imminent threat to the safety of the officers and cannot be controlled by hands-on control measures or

techniques.[5] Additionally, there is a broad consensus that pepper spray should not be used against individuals who are in mental health crisis.[6]

66. The use of a taser on an individual who is unarmed and passively resisting constitutes excessive force. Similarly, continuing to use the taser after the person has been subdued, or repeatedly using the taser over a prolonged period of time, constitutes excessive force.

67. Physical force should not be used on an individual in restraints. In the rare case where force is objectively reasonable to prevent an individual's escape or imminent bodily injury to the individual, the law enforcement officer, or another person, only the minimal amount of force necessary to control the situation should be used.

68. The use of a chokehold or other hold that compresses the neck, restricts the airway, or interrupts the flow of oxygenated blood to the brain of an individual who is not resisting–or who was initially resisting but stopped–constitutes excessive force.[7] A chokehold can constitute deadly force, and, as such, is prohibited unless deadly force is justified. Even in the rare case where a chokehold may be permitted, continuing to use it after an individual has been restrained and any threat to the law enforcement officers or the individual themselves has been eliminated constitutes excessive force.

---

[5] *See*, *e.g.*, CALEA Standards for Law Enforcement Agencies 1.3.4, "Use of Authorized Less Lethal Weapons."
[6] *See*, *e.g.*, Chuck Wexler, "The Evolution of Less Lethal Weapons," *Refining the Role of Less Lethal Technologies*, Police Executive Research Forum (2020) at 19, available at https://www.policeforum.org/assets/LessLethal.pdf.
[7] A chokehold is a physical maneuver that restricts an individual's ability to breathe for the purpose of incapacitation ("air choke") or places pressure on the individual's carotid arteries to restrict the flow of blood to the brain and render them unconscious ("carotid hold" or "vascular neck restraint"). Chokeholds are dangerous maneuvers that can result in serious bodily injury or death. *See* Trevor George Gardner & Esam Al-Shareffi, *Regulating Police Chokeholds*, 112 J. CRIM. L. & CRIMINOLOGY ONLINE 111, 115-18 (2022).

69. Once a situation has been controlled, law enforcement officers should provide appropriate medical care consistent with their training, such as providing first aid, or request medical attention, such as calling emergency medical services and arranging for transportation to a hospital.

70. The Americans with Disabilities Act (ADA) requires that reasonable accommodations be made when law enforcement officers are engaging with individuals with a mental illness.

71. Law enforcement officers must take special care when responding to a situation involving an individual with a mental illness, whose behavior should be understood to be a result of their mental illness rather than a disciplinary issue.

72. BSO has a history of using excessive force, failing to de-escalate situations, improperly restraining individuals, unnecessarily striking individuals, and using chokeholds and pepper spray without justification.

73. On information and belief, BSO's "Cell Extraction," "Restraint Chair Use," and "Restraint Hold" policies are inadequate.

74. On information and belief, it is the custom, practice, policy, and/or procedure of BSO to remove individuals from their cells by handcuffing them in the front rather than behind the back.

75. On information and belief, it is the custom, practice, policy, and/or procedure of BSO to restrain individuals in restraint chairs by standing behind them while they are seated in the chair and holding their neck and/or head while they are being strapped into the chair.

76. On information and belief, an individual identified as "RS" died after being placed in a restraint chair in the jail.[8] After repeatedly banging his head against his cell door, he was given an Emergency Treatment Order ("ETO") for medication, removed from his cell, and placed in a restraint chair. Shortly after being placed in the restraint chair, RS was "found without a pulse and not breathing."[9]

77. In July 2018, BSO deputies and a lieutenant allegedly repeatedly kicked and stomped on a man who had been secured in handcuffs and restraints. The deputies also pepper sprayed the man while restrained.[10]

78. In December 2019, a BSO Deputy in NBB punched an incarcerated woman 13 times in rapid succession before throwing her on the floor.[11]

79. In October 2020, a BSO detention deputy repeatedly struck an individual in the NBB's infirmary unit with a flashlight.[12]

80. On information and belief, BSO did not cure the deficiencies in its use of force practices, policies, and procedures in response to these incidents.

81. Individuals in a mental health crisis in the Broward County Jail are regular targets of unnecessary force.

---

[8] *Carruthers v. Israel*, 76-cv-06086, ECF 1064-1, Mental Health Report – Jail Baseline Conditions - Kathryn A Burns MD, MPH (dated November 20, 2020), at 11.

[9] *Id.*

[10] *Smith v. Israel*, 18-cv-62098 (S.D. Fla. Oct. 1, 2018).

[11] Karen Hensel and Daniel Cohen, *Jail video shows detention deputy repeatedly punching female inmate, BSO review finds no misconduct.*, 7 News Miami (Nov. 17, 2020), available at https://wsvn.com/news/investigations/jail-video-shows-detention-deputy-repeatedly-punching-female-inmate-bso-review-finds-no-misconduct/.

[12] *Broward detention deputy charged with striking inmate*, Broward County State Attorney (Aug. 12, 2021), available at https://browardsao.com/detention-deputy-charged-081221/.

82. BSO does not involve mental health clinicians in its security staff's attempts to de-escalate crises where an individual's disruptive or combative behavior is a manifestation of a condition or mental illness.[13]

83. BSO also does not have a policy of involving clinicians in disciplinary decisions where an individual's behavior is a manifestation of a condition or mental illness.[14]

84. As a result, BSO regularly punishes individuals in a mental health crisis when their failure to comply with rules is the result of their mental health condition. This punishment sometimes takes the form of unnecessary physical force.[15]

85. Defendant Tony is aware that BSO deputies regularly use improper force, including against individuals in mental health crisis. In particular, he has received multiple letters documenting these incidents from the Broward County Office of the Public Defender. On information and belief, Defendant Tony has failed to implement changes to policies or training on use of force despite multiple incidents of excessive force.

### BSO, Wellpath, and Supervisory Defendant Tony's Policy and Practice of Inadequate Medical Treatment

86. Medical professionals in a jail are required to act if they have knowledge of an individual's serious medical needs or if the need for medical care is obvious.

87. Jail personnel are required to act—by either administering emergency aid or requesting that medical professionals administer aid—if they have knowledge of an individual's serious medical needs or if the need for medical care is obvious.

---

[13] *Carruthers v. Israel*, 76-cv-06086, ECF 1043-1, Initial Report of Joint Mental Health Expert Kathryn A Burns MD, MPH (dated August 8, 2018), at 45-46.
[14] *Id.*
[15] *Id.*

88. Wellpath and Broward County Jail have a history of failing to provide adequate medical treatment, including emergency medical treatment.

89. In 2018, Broward County Jail contracted with Wellpath (then called "Correct Care") to provide services to detainees. Before the contract was finalized, concerns were raised about Wellpath, including accusations of needless death and inadequate care.[16] At the time, there were no less than 24 federal lawsuits related to inmate deaths and 145 federal lawsuits related to negligent care.[17]

90. CNN's 2019 investigation into Wellpath revealed the company failed to get incarcerated individuals emergency care and provided substandard care that led to avoidable deaths and other serious outcomes.[18]

91. On information and belief, Wellpath's "Emergency Services" policy does not clearly instruct, direct, or require staff to provide prompt treatment or resuscitative measures to an individual in emergency situations.

92. On information and belief, Wellpath's "Emergency Services" policy does not provide a chain of command for emergency response situations and does not make clear whether health services staff need permission from correctional staff to evaluate an individual who may need emergency treatment.

93. On information and belief, Wellpath's "Emergency Services" policy does not permit health services staff to independently determine whether an individual requires emergency services.

---

[16] Dan Christensen, *New Broward jail healthcare provider has grim history of lawsuits, deaths*, Florida Bulldog (June 25, 2018), available at https://www.floridabulldog.org/2018/06/new-broward-jail-healthcare-provider-has-grim- history-of-lawsuits-deaths/.

[17] *Id.*

[18] Blake Ellis and Melanie Hicken, *Please Help Me Before It's Too Late*, CNN (June 25, 2019), available at https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

94. BSO and Wellpath have a history of ignoring serious medical needs and delaying the provision of treatment.

95. On information and belief, before "RS" was removed from his cell and placed in a restraint chair, where he died shortly thereafter, an earlier order for emergency medication was ignored by BSO staff and a deputy refused to open the cell door to allow medical staff to administer the medication.[19]

96. In 2019, a pregnant woman going into labor was ignored by BSO staff and accused of lying. Despite complaining about pain for a week, she was only taken to the hospital after she showed staff she was bleeding and her water broke.[20]

97. On information and belief, in June 2022, an individual identified as "KL" died after Wellpath medical staff failed to examine him despite Wellpath mental health staff informing them that KL had become non-verbal and had difficulty moving.[21] KL had been psychiatrically hospitalized and diagnosed with schizophrenia but was not receiving his prescribed medication after he returned to the jail.[22]

### *BSO, Wellpath, and Supervisory Defendant Tony's Policy and Practice of Inadequate Mental Health Treatment*

98. Individuals being held pre-trial in jail are entitled to reasonable medical and mental health care, including mental health assessments, qualified staff to monitor mental health conditions, medication and specific procedures when medication is "refused," access to mental health programming, and transfer to facilities better equipped to handle mental health needs.

---

[19] Mental Health Report – Jail Baseline Conditions, *supra* note 8, at 11, 38.

[20] Layron Livingston, *Second pregnant woman almost gave birth in Broward jail cell*, Local 10 (May 21, 2019), available at https://www.local10.com/news/2019/05/21/second-pregnant-woman-almost-gave-birth-in-broward-jail-cell/.

[21] Mental Health Report – Status of Compliance with Settlement Agreement Terms, *supra* note 1, at 33-34.

[22] *Id.*

99. NBB is "a minimum to medium-security, special needs detention facility" intended to "house and manage the mentally ill, medically infirm and special needs inmate population."[23]

100. Broward County Jail has a decades-long history of failing to provide adequate mental health treatment.

101. The jail has been subject to oversight since the 1970s and remains under a consent decree, last updated in August 2018, that requires it to meet various mental health standards related to intake screening assessments, access to care, referrals, periodic assessments, medications, and discipline, segregation, and use of force, among other areas.

102. BSO entered into a contract with Wellpath in 2018 despite the company's long, public history of abuse and neglect.[24]

103. Despite court-ordered improvements and monitoring, Broward County Jail has consistently failed to provide access to adequate mental health care or appropriate and life-saving treatment to individuals with mental illness. For instance, BSO regularly fails to provide: (1) alternative treatment plans for individuals who refuse medication; (2) standing plans for medication management; and (3) psychiatric contacts based on symptoms or clinical need.

104. BSO has also repeatedly failed to hospitalize individuals whose mental health conditions cannot be managed in the jail and made housing decisions without

---

[23] North Broward Bureau, *supra* note 4.

[24] Dan Christensen, *New Broward Jail Healthcare Provider Has Grim History of Lawsuits, Death*, Florida Bulldog, Jun. 25, 2018, https://www.floridabulldog.org/2018/06/new-broward-jail-healthcare-provider-has-grim-history-of-lawsuits-deaths/

a psychiatrist properly evaluating whether a particular assignment or means of confinement will exacerbate an individual's condition.[25]

105.     BSO has repeatedly allowed individuals with mental health conditions to decompensate at the jail instead of transferring them to another facility that could provide a higher level of mental healthcare.

106.     On information and belief, an inmate identified as "LB" was accepted into the jail after intake screening instead of being sent to a psychiatric hospital despite acting "bizarre" and "agitated."[26] He later deteriorated and regressed to the point where he could not meaningfully communicate.[27]

107.     On information and belief, in February 2017, an individual identified as "TD" was brought to NBB because he was refusing food and medication.[28] BSO deputies reported that medical staff did not enter his cell to examine him, leading to his condition worsening.[29]

108.     On information and belief, in April 2015, an individual identified as "DW" entered the jail and remained at the jail instead of being transferred to a treatment facility.[30] He did not receive medication and decompensated until his decompensation was so severe that he was finally transferred in September 2016.[31]

109.     BSO has repeatedly failed to provide individuals with mental health conditions their prescribed medication.

---

[25] Livingston, *supra* note 20, at 14.

[26] Initial Report of Joint Mental Health Expert, *supra* note 13, at 32.

[27] *Id.*

[28] *Carruthers v. Israel*, 76-cv-06086, ECF 1043-2, Appendix: Inmate Record Reviews/Summaries/Interviews – Kathryn A Burns MD, MPH (dated August 8, 2018), at 29.

[29] *Id.*

[30] *Id.* at 60.

[31] *Id.*

110.     On information and belief, in February 2023, Wellpath staff failed to order medication for an individual identified as "AB" even though an "emergent referral" was documented during his mental health screening and he had been prescribed antipsychotic and antidepressant medications during his prior stay at the jail in 2022.[32]

111.     On information and belief, in January 2013, an individual identified as "SS" had schizophrenia but did not receive his medication despite medical staff having access to his medication.[33]

112.     On information and belief, an individual identified as "SR 2" had been treated in a psychiatric hospital right before his arrival at the jail and had a recent history of self-harm, yet his medication was discontinued without explanation once he arrived at the jail.[34]

113.     On information and belief, an individual identified as "DB" had been hospitalized before and during his time in custody at the jail but the medication he had been prescribed at the hospital was not ordered when he returned to the jail and no explanation was provided.[35]

114.     On information and belief, Wellpath's "Basic Mental Health Services" policy does not provide for individuals taking psychotropic medication to see a psychiatrist regularly.

---

[32] Mental Health Report – Status of Compliance with Settlement Agreement Terms, *supra* note 1, at 10.
[33] Appendix: Inmate Record Reviews/Summaries/Interviews, *supra* note 27, at 72.
[34] Mental Health Report – Jail Baseline Conditions, *supra* note 8, at 22.
[35] *Id.*

115.     On information and belief, Wellpath's "Psychiatric Services" policy does not have clear directives or instructions for staff on how to handle inmate refusal to take prescribed psychotropic medication.

116.     BSO has repeatedly failed to address deficiencies in mental health assessments, including incomplete forms and sparse clinician narratives, leading to inaccurate assessments and reporting.

117.     On information and belief, in June 2022, Wellpath staff did not assess an individual identified as "MN" who was laying in his cell in the fetal position and not responding.[36] For several weeks, he "deteriorated physically and mentally."[37] Despite his condition, a registered nurse noted that he was "alert and oriented x4" and his "speech [was] spontaneous and relevant"—an impossibility considering his "regressed condition."[38]

118.     On information and belief, in December 2019, an individual identified as "RW" was observed to be "grossly psychotic" and identified as "having a serious mental illness," yet just a few days later, an assessment by a Wellpath nurse checked every box as "normal"—an impossibility considering his mental health condition.[39]

119.     On information and belief, in January 2020, an individual identified as "JH" was noted by Wellpath staff to be non-verbal and, at the same time, have "slurred speech; irritable mood; labile affect; coherent thought form; appropriate thought

---

[36] Mental Health Report – Status of Compliance with Settlement Agreement Terms, *supra* note 1, at 34.
[37] *Id.*
[38] *Id.*
[39] Mental Health Report – Jail Baseline Conditions, *supra* note 8, at 26-27.

content; oriented to person, place, time and situation; intact memory; good insight and good judgment"—an impossibility if he was not speaking to the medical staff.[40]

120.     BSO's persistent failures to treat mental illness have resulted in individuals incarcerated at BSO engaging in self-harm and other injuries. For instance, in September 2018, an individual self-mutilated after refusing his medication and food.[41]

121.     In April 2019, Wellpath staff at the jail ignored a mentally ill pregnant woman who went into labor for almost seven hours, forcing the woman to deliver her baby alone in her cell without any medical assistance or medication.[42]

122.     In June 2019, two men housed in NBB died after BSO deputies and Wellpath staff failed to provide necessary mental health and medical care. One of the men was crying out repeatedly for medical attention but was ignored.[43]

123.     On information and belief, in November 2021, an individual identified as "EF" was found hanging and unresponsive in the jail and died in the hospital days later.[44] Despite reporting during a mental health assessment that he was bipolar and needed his medication, had made a suicide attempt in the past, and had been psychiatrically hospitalized on three occasions, EF's psychiatric assessment was

---

[40] *Id.* at 32.

[41] Eric Balaban and Stephanie Wylie, *A Mentally Ill Man in Solitary Cut Off a Body Part at the Broward County Jail*, ACLU (Mar. 28, 2019), available at https://www.aclu.org/blog/prisoners-rights/medical-and-mental-health-care/mentally-ill-man-solitary-cut-body-part-broward.

[42] Blake Ellis and Melanie Hicken, *Dangerous jail births, miscarriages, and stillborn babies blamed on the same billion dollar company*, CNN (May 7, 2019), available at https://www.cnn.com/2019/05/07/health/jail-births-wellpath-ccs-invs/index.html; Deanna Paul, *A pregnant inmate came to term in jail. Lawyers say she was forced to give birth there — alone.*, The Washington Post (May 6, 2019), available at https://www.washingtonpost.com/nation/2019/05/04/mentally-ill-woman-gives-birth-alone-broward-county-jail-attorney-says/.

[43] Rafael Olmeda, *Public defender seeks investigation after two jail deaths*, South Florida Sun Sentinel (Jun. 18, 2019), available at https://www.sun-sentinel.com/local/broward/fl-ne-jail-death-mysteries-20190618-xh7qpigqpjf3be5f2jhvfdibiu-story.html.

[44] Mental Health Report – Status of Compliance with Settlement Agreement Terms, *supra* note 1, at 12.

delayed and he did not see a psychiatrist or start taking medication for almost two weeks.[45]

124.     In October 2022, a young woman with severe mental illness in BSO custody hanged herself in her cell in NBB.[46]

125.     On information and belief, after Wellpath staff discontinued SR 2's prescribed medication, he told a nurse that he heard voices telling him to "harm society" and asked to be put back on his prescribed medication.[47] He was told it was "non-formulary" and he was not referred to a psychiatrist to discuss it.[48] Two months later, he attempted hanging at the jail and died in the hospital.[49]

126.     BSO has repeatedly failed to provide individuals suffering with mental illness with the mental health treatment and care they need to become clinically stable enough to participate in mental health programming, resulting in only a fraction of individuals in NBB being able to access programming like daily treatment programs and group treatment, depriving them of programs accessed by other inmates.[50] Out-of-cell treatment opportunities, such as psychoeducational video programming, yoga classes, and off-unit confidential space are only available to a select few.[51]

127.     BSO has similarly failed to provide individuals suffering from mental illness with the mental health treatment and care they need to become clinically

---

[45] *Id.*

[46] Alex Deluca, *"Strikingly Avoidable": Broward Jail Policies Questioned Again After Young Woman's Suicide*, Miami New Times (Oct. 31, 2022), available at: https://www.miaminewtimes.com/news/mentally-ill-inmates-are-dying-from-neglect-in-broward-public-defender-says-15565572.

[47] Mental Health Report – Jail Baseline Conditions, *supra* note 8, at 22.

[48] *Id.*

[49] *Id.*

[50] Initial Report of Joint Mental Health Expert, *supra* note 13, at 16-17.

[51] Mental Health Report – Jail Baseline Conditions - Kathryn Burns, *supra* note 8, at 30.

stable enough to receive out-of-cell time and recreation time and engage in social interactions and cell front interactions, depriving them of jail conditions accessed by other inmates.[52]

128.    On information and belief, in December 2019, an individual identified as "JI" refused medication and remained on psych observation where he was "housed alone" and did not have the "opportunity to interact or participate in out-of-cell treatment," leading him to "become[] grossly psychotic again."[53]

129.    On February 6, 2011, at 10:00AM a mentally ill inmate, William Campbell, became hypotensive after being in the Broward County Jail for one day. The medical provider at the time was made aware of this serious medical condition and failed to have Mr. Campbell transported to the hospital when hospitalization was necessary. Campbell was not transported to the hospital until February 7, 2011, where he later died.[54]

130.    The Mortality or Morbidity Review relating to William Campbell was reviewed at a meeting on February 31, 2011, that was attended by the then medical provider's regional vice president, Health Services Administrator, medical director and director of nursing as well as eight other high-ranking employees. Therefore, the medical provider and BSO through their policymakers were aware of the problems outlined above in the care of Mr. Campbell including that the decision to transfer him to an outside hospital was delayed at least 24 hours. However, the

---

[52] *Id.*
[53] *Id.* at 38-39.
[54] *Obremski v. Armor*, 18-cv-61798, ECF 1.

medical provider and BSO failed to take any corrective action to prevent future deaths. [55]

131.     Several other inmates suffered fates similar to William Campbell's.

a.   October 10, 2011, Gary Joseph Smith, a mentally ill man was transferred to the Broward County Jail Infirmary instead of the hospital where he became dehydrated and suffered from acute renal failure with metabolic encephalopathy. Mr. Smith died in the hospital.[56]

b.   Raleigh Priester, who battled with severe mental health problems, including schizophrenia, was placed in Broward County's solitary confinement for months, in 2012, where he was eventually found dead and weighing 120 pounds less than when he first came into the jail. BSO and the medical provider failed to properly treat Mr. Priester.[57]

c.   William Herring Jr., a mentally ill inmate in Broward County Jail told the medical providers that he was fasting and would not eat, drink or take medication because that is what God asked of him. Then Broward Circuit Court Judge Singhal entered an order directing the medical provider and BSO to immediately have Mr. Herring seen by the psychiatric staff. The order was ignored by BSO and the medical provider. The medical provider ignored Mr. Herring's need for medical attention. On November 16, 2012, Mr. Herring collapsed and was taken to Broward General Medical Center

[55] *Id.*
[56] *Id.*
[57] *Id.*

where he was found to be severely dehydrated and was exhibiting almost no brain activity. His family took him off life support and he died.[58]

d. Simon Valacheryil, a mentally ill inmate in the North Broward Bureau infirmary was weak, frail, and unable to get out of bed. His blood tests showed that he was critically dehydrated and suffering from an acute and severe infection. The medical provider failed to have Mr. Valacheryil transferred to an outside hospital for care despite knowledge that Mr. Valacheryil needed hospitalization. By the time that Mr. Valacheryil was transferred to the hospital there was nothing hospital staff could do, and he died at 5:52AM on January 7, 2015.[59]

132.     Defendant Tony is aware of BSO and Wellpath's deficient policies. On information and belief, Defendant Tony has failed to implement changes to policies or training despite multiple incidents of deliberate indifference to medical needs.

133.     On information and belief, BSO and Defendant Tony extended Wellpath's contract in or around 2021 despite the company's poor record of performance.[60]

*BSO's Deficient Training, Supervision, and Discipline on Use of Force*

134.     BSO has inadequately trained its deputies, including the individual defendants, on use of force, failed to supervise its deputies on using force, ignored or inadequately investigated use of force incidents, including Kevin's death, and failed to discipline deputies following use of force incidents.

---

[58] *Id*.
[59] *Id*.
[60] Dan Christensen, *New Broward Jail Healthcare Provider Has Grim History of Lawsuits, Death*, Florida Bulldog, Jun. 25, 2018, https://www.floridabulldog.org/2018/06/new-broward-jail-healthcare-provider-has-grim-history-of-lawsuits-deaths/

135.    On information and belief, BSO does not require deputies found to be in violation of force standards to complete additional training. In fact, Defendants Howard and Daniel were assigned additional training for using improper force and restraint techniques against Kevin but have not been required to complete it.[61]

136.    BSO has also inadequately trained its deputies, including the individual defendants, on use of force against individuals with mental health issues.

137.    On information and belief, while BSO provides crisis intervention training to deputies on how to deescalate interactions with individuals in mental health crisis, this training is not mandatory.[62]

138.    On information and belief, BSO has not disciplined any deputies for using excessive force. In fact, Defendants Howard and Daniel received positive annual reviews following Kevin's death.[63]

### *BSO's Deficient Training, Supervision, and Discipline on Responding to Mental Health and Medical Emergencies*

139.    BSO has inadequately trained its deputies, including the individual defendants, on the appropriate medical responses to mental health and medical emergencies in mental health areas of the jail.

140.    On information and belief, BSO has not implemented new or additional training in response to the numerous deaths that have resulted from inadequate supervision and treatment of individuals with mental illness housed in NBB.[64]

---

[61] Gloria Oladipo, *Kevin Desir Died A Brutal Death. His Family Believes Deputies at a Notorious Florida Jail Are Responsible*, THE GUARDIAN (Dec. 5, 2022), available at https://www.theguardian.com/us-news/2022/dec/05/florida-kevin-desir-death-family-believes-jail-deputies-responsible.

[62] *Id.*

[63] *Id.*

[64] Dan Christensen, *Broward's Jails Have Hundreds of Cameras Inside, But Sheriff Tony Won't Release Video When Deputies Are Accused of Brutalizing Inmates*, FLORIDA BULLDOG, May 31, 2022,

141.     On information and belief, BSO has failed to train a sufficient number of mental health staff to provide mental health treatment services including counseling and psychosocial programming.[65]

142.     On information and belief, BSO failed to discipline its staff, including the individual defendants, for failing to provide or seek emergency medical or mental health treatment in a timely manner.

### *Wellpath's Deficient Training, Supervision, and Discipline on Mental Health Treatment and Responding to Mental Health and Medical Emergencies*

143.     Wellpath staff failed to provide mental health treatment in line with Kevin's existing treatment plan.

144.     On information and belief, Wellpath has inadequately trained its staff, including the individual defendants, on providing treatment and services to individuals with mental health conditions.

145.     On information and belief, Wellpath failed to provide adequate training on how to follow treatment plans for individuals with mental illness, including individuals who "refuse" to take their medication or eat.

146.     Wellpath staff was present while Defendants were using force on Kevin and failed to timely administer aid.

147.     On information and belief, Wellpath failed to provide adequate training to its staff, including the individual defendants, on (1) responding to calls for medical and mental health emergencies; (2) providing emergency care following an assault;

---

https://www.floridabulldog.org/2022/05/broward-jails-have-hundreds-of-cameras-inside-but-sheriff-wont-release-video/.

[65] Initial Report of Joint Mental Health Expert, *supra* note 13, at 65.

(3) providing emergency care when correctional officers are involved; and (4) determining when to call for EMTs for assistance.

148.    CNN's 2019 investigation into Wellpath revealed that the company repeatedly relied on inexperienced workers and provided minimal training.[66]

149.    On information and belief, Wellpath failed to discipline its staff, including the individual defendants, for failing to provide or seek emergency medical or mental health treatment in a timely manner.

## CAUSES OF ACTION

### COUNT 1
### 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Use of Excessive Force
### (Defendants Ryan Daniel, Angela McNeal, Kimberly Green, Christopher Williams, Devon Parker, and Jeremiah Howard)

107.    Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 61-85, and 139-142.

108.    Kevin had a right to be free from the use of excessive force under the Fourteenth Amendment, which requires that any force used against a pretrial detainee be objectively reasonable under the totality of the circumstances.

109.    Defendants Daniel, McNeal, Green, Williams, Parker, and Howard deprived Kevin of his right against the use of excessive force under the Fourteenth Amendment. Defendants are sued in their individual capacities.

110.    After removing Kevin from his cell, Defendants Daniel, McNeal, Green, Williams, Parker, and Howard pulled him to the floor, dragged him across the floor

---

[66] Blake Ellis and Melanie Hicken, *Please Help Me Before It's Too Late*, CNN (June 25, 2019), available at https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

of the pod, and pressed down on his body, some using the entirety of their body weight, for approximately four minutes.

111. During this time, Defendant Daniel tasered Kevin twice and Defendant Howard struck Kevin with his fist no less than ten times.

112. Shortly after Kevin was pulled up and dragged over to the restraint chair by Defendants, Deputy McNeal pepper sprayed Kevin directly in the face.

113. There was no factual or legal basis for Defendants Daniel, McNeal, Green, Williams, Parker, and Howard to use the force described against Kevin.

114. Defendants' use of excessive force against Kevin was unreasonable, unnecessary, gratuitous, and punitive.

115. Defendants' use of excessive force exacerbated Kevin's mental health crisis and prevented the provision of mental health and medical care Kevin needed.

116. As a direct result of Defendants' use of excessive force, Kevin experienced conscious pain and suffering.

117. Accordingly, Defendants Daniel, McNeal, Green, Williams, Parker, and Howard violated Kevin's Fourteenth Amendment right to be free from excessive force.

**COUNT 2**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Use of Excessive Force**
**(Defendant Jeremiah Howard)**

118. Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 61-85, and 139-142.

119.     Defendant Howard deprived Kevin of his right against the use of excessive force under the Fourteenth Amendment. Defendant is sued in his individual capacity.

120.     After Kevin was placed in the restraint chair, Defendant Howard tightly gripped Kevin's neck and forcefully pulled Kevin's head up and back, while Defendant Howard drove his own feet into the ground and the chair for additional support, for five minutes. Defendant Howard even readjusted his stance several times in order to get a tighter grip around Kevin's neck. For the last minute of Defendant Howard's five-minute hold, Kevin is fully restrained in the chair. Kevin's body began to convulse and eventually Kevin became limp and unresponsive. Defendant Howard slapped Kevin's right cheek to see if he was still conscious after strangulation. Kevin remained unresponsive.

121.     There was no factual or legal basis for Defendant Howard to use the force described in this Complaint against Kevin.

122.     Defendant's use of excessive force against Kevin was unreasonable, unnecessary, gratuitous, and punitive.

123.     Defendant's use of excessive force while he was in the restraint chair exacerbated Kevin's mental health crisis.

124.     As a direct result of Defendant's use of excessive force, Kevin experienced conscious pain and suffering and later died as a result.

125.     Accordingly, Defendant Howard violated Kevin's Fourteenth Amendment right to be free from excessive force.

**COUNT 3**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Excessive Force –**
**Failure to Intervene**
**(Defendants Ryan Daniel, Angela McNeal, Kimberly Green, Christopher**
**Williams, and Devon Parker)**

126.     Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 61-85, and 139-142.

127.     Defendants Daniel, McNeal, Green, Williams, and Parker deprived Kevin of his right against the use of excessive force under the Fourteenth Amendment. Defendants are sued in their individual capacities.

128.     Defendants Daniel, McNeal, Green, Williams, and Parker saw Defendant Howard grip Kevin's neck tightly for five minutes while they strapped Kevin into the restraint chair. They watched as Defendant Howard continued to grip Kevin's neck for at least a full minute after Kevin was fully restrained.

129.     Defendants Daniel, McNeal, Green, Williams, and Parker had ample opportunity to intervene and break Defendant Howard's chokehold. Yet, after they finished securing Kevin in the restraint chair, Defendants Daniel, McNeal, Green, Williams, and Parker simply stood by and watched as Defendant Howard maintained his grip on Kevin's neck until Kevin became unresponsive.

130.     As a direct result of Defendants' failure to intervene against Defendant Howard's use of excessive force, Kevin experienced conscious pain and suffering and later died.

131.     Accordingly, Defendants Daniel, McNeal, Green, Williams, and Parker violated Kevin's Fourteenth Amendment right to be free from excessive force.

**COUNT 4**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Use of Excessive Force**
**(Defendant Sheriff Gregory Tony)**

132.    Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 61-85, and 139-142.

133.    The violations of Kevin's constitutional rights alleged in the above counts were committed by Defendants Daniel, McNeal, Green, Williams, Parker, and Howard while they were acting on behalf of Defendants Broward County and Tony, pursuant to the customs, practices, policies, and/or procedures of BSO.

134.    Defendants Broward County and Tony are liable for the violations of Kevin's constitutional rights because they implemented, maintained, and enforced the customs, practices, policies, or procedures that directed, encouraged, or permitted the individual defendants to use excessive force against inmates being held in Broward County jail facilities.

135.    Defendants Broward County and Tony knew that their customs, practices, policies, or procedures constituted excessive force.

136.    As a result of the customs, practices, policies, or procedures that directed, encouraged, or permitted the individual defendants to use excessive force, the individual defendants used excessive force on Kevin during his mental health crisis, causing conscious pain and suffering and later death.

137.    Accordingly, Defendant Tony are liable for the violation of Kevin's Fourteenth Amendment right to be free from excessive force.

**COUNT 5**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Deliberate Indifference to Serious Medical Needs**
**(Defendants Ryan Daniel, Angela McNeal, Kimberly Green, Christopher Williams, Devon Parker, and Jeremiah Howard)**

138. Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 86-97, 99-133, and 139-142.

139. At all times while he was being held in the Main Jail Bureau and NBB, Kevin was suffering from a serious and persistent mental illness that required substantial attention, observation, medication, and treatment in order from him to remain competent, stable, and capable for caring for himself, and to prevent him from committing self-harm.

140. Defendants Daniel, McNeal, Green, Williams, Parker, and Howard were aware of Kevin's serious and persistent mental illness.

141. In fact, Kevin was placed in NBB, a specific unit for those with mental illness.

142. After Kevin's condition deteriorated due to a lack of medication and treatment, he quickly destabilized, as evidenced by him stripping naked, flooding his cell, and cutting himself. It would have been obvious to anyone who observed Kevin, even lay persons, that he was experiencing a serious mental health crisis requiring medical attention and treatment.

143. Defendants had actual knowledge of Kevin's mental health and medical needs, yet they responded to his mental health crisis by forcibly removing him from his cell, dragging him across the floor, and pinning him to the ground while using

36

excessive force–tasing him, punching him, and putting all of their weight on him. All while medical personnel, i.e., Defendant Datus, stood by.

**COUNT 6**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Deliberate Indifference to Serious Medical Needs**
**(Defendants Ryan Daniel, Angela McNeal, Kimberly Green, Christopher Williams, Devon Parker, and Jeremiah Howard)**

139. Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 86-97, 99-133, and 139-142.

140. Defendants were informed and observed that Kevin suffered serious injuries. Kevin was limp in the restraint chair, unresponsive, and Defendants did not administer CPR until over five and a half minutes after Kevin lost consciousness.

141. Not only was Kevin not being examined during his mental health crisis but now his physical injuries were going unexamined and untreated as well.

142. After Kevin's body went limp in the restraint chair, Defendants did not immediately call back Wellpath staff to examine Kevin, who at this point has not been assisted by medical personnel at all.

143. It would have been obvious to anyone who observed Kevin limp and unresponsive in the restraint chair, including lay persons, that a quick medical intervention was needed. Yet, despite knowing that a chokehold presents a serious risk of harm, Defendants delayed in calling medical personnel or administering emergency aid themselves.

144. Defendants' knowledge of Kevin's obvious, serious medical needs constitutes actual knowledge of an objectively cruel condition.

145.     Defendants' failure to provide medical care for his obvious, serious medical needs was an objectively unreasonable response to a known, substantial risk.

146.     As a result of Defendants' deliberate indifference to Kevin's serious medical needs, Kevin experienced conscious pain and suffering and later died.

147.     Accordingly, Defendants' deliberate indifference to Kevin's serious medical needs constitutes the unnecessary and wanton infliction of pain prohibited by the Fourteenth Amendment.

148.     Defendants' acts or omissions were deliberately indifferent to Kevin's serious medical needs, thereby depriving him of due process under the Fourteenth Amendment.

**Count 7**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Deliberate Indifference to Serious Medical Needs**
**(Defendants Etude Petit-Homme Datus, Jane Does #1-3)**

149.     Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 86-97, 99-133, and 143-149.

150.     At all times while he was being held in the Main Jail Bureau and NBB, Kevin was suffering from a serious and persistent mental illness that required substantial attention, observation, medication, and treatment in order from him to remain competent, stable, and capable of caring for himself, and to prevent him from committing self-harm.

151.     Defendants Datus, and Jane Does #1, #2, and #3 were aware of Kevin's serious and persistent mental illness and his need for medical and mental health treatment and services, substantial attention, and observation.

152. Defendants Datus, and Jane Does #1, #2, and #3 violated Kevin's right to adequate medical treatment for his serious mental illness by failing to provide him with, or seek out, the medical care Kevin needed. Defendants are sued in their individual capacities.

153. Defendants failed to provide Kevin with adequate mental health treatment and services prior to the assault. They did not administer Kevin's medication, they did not escalate the issue of Kevin refusing meals, and they did not attempt to transfer Kevin to another facility that was better equipped to treat his mental illness.

154. Defendant Datus and Jane Doe #1 were called to examine Kevin after he reportedly cut himself in his cell but did not provide any medical attention prior to him being extracted from his cell, after the assault in the pod ended, or after Kevin was restrained in the restraint chair.

155. Even after Defendant Datus approached Kevin while he was in the restraint chair, she did not provide any medical attention–beyond wiping his eyes after he was pepper sprayed–until after Kevin was limp and unresponsive.

156. Jane Does #2 and #3 did not provide Kevin with any medical attention despite watching him get forcibly strapped into the restraint chair and get pepper sprayed. They did not provide any medical attention until after Defendant Datus approached Kevin's limp and unresponsive body in the restraint chair.

157. It would have been obvious to anyone who observed Kevin, including lay persons, that a quick medical intervention was needed. Yet, despite knowing that Kevin had a self-inflicted injury, had suffered injuries from an assault, and had been

39

held in a chokehold until he became unresponsive, Defendants delayed in administering emergency aid or calling for EMTs.

158. Defendants' knowledge of Kevin's obvious, serious medical needs constitutes actual knowledge of an objectively cruel condition.

159. Defendants' failure to provide medical care for his obvious, serious medical needs was an objectively unreasonable response to a known, substantial risk.

160. As a result of Defendants' deliberate indifference to Kevin's serious medical needs, Kevin experienced conscious pain and suffering and later died.

161. Accordingly, Defendants' deliberate indifference to Kevin's serious medical needs constitutes the unnecessary and wanton infliction of pain prohibited by the Fourteenth Amendment.

**COUNT 8**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Deliberate Indifference to Serious Medical Needs**
**(Defendants Gregory Tony, Wellpath LLC, and Wellpath Management Inc.)**

162. Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 86-97, 99-133, 139-142, and 143-149.

163. The violations of Kevin's constitutional rights alleged in the above counts were committed by the individual defendants while they were acting on behalf of their respective employers, pursuant to the customs, practices, policies, and/or procedures of their respective employers.

164. Defendant Tony had the duty and responsibility to oversee the operation of the Broward County jail facilities to set its customs, practices, policies, and procedures, and to ensure that the constitutional rights of the inmates incarcerated at that facility were not violated.

40

165.     Wellpath Defendants were responsible for the administration, supervision, and delivery of health and medical services, including mental health, at the Broward County jail facilities.

166.     It was the custom, practice, policy or procedure of Defendant Tony and the Wellpath Defendants to incarcerate individuals with serious and persistent mental health illnesses in the Broward County jail facilities without providing the adequate personnel, facilities, resources, knowledge, training, experience, or expertise to care for these individuals.

167.     Defendant Tony and the Wellpath Defendants knew that the personnel, facilities, resources, knowledge, training, experience, and expertise available in the Broward County jail facilities was inadequate to sufficiently care for the serious and persistent mental illnesses of inmates incarcerated there, and they knew that the likely consequence of these inadequacies was that the inmates' mental illnesses would worsen and that their stability and competence would deteriorate.

168.     Defendant Tony and the Wellpath Defendants knew that it was likely that mentally ill inmates would attempt to harm themselves or others as a result of the lack of care and their subsequent deterioration, yet they failed to provide the care required to prevent these individuals from decompensating.

169.     The inmates housed in the Broward County jail facilities have a clearly established constitutional right to receive adequate care for their serious and persistent mental health illnesses.

170.     Defendant Tony and the Wellpath Defendants knew that use of force, including but not limited to, the use of tasers, pepper spray, restraint chairs, and

chokeholds, present a serious risk of harm, especially if immediate medical attention is needed after their use but not provided or delayed.

171.     Defendant Tony and the Wellpath Defendants failed to address this serious risk of harm or take adequate measures to cure deficiencies in its administration of emergency medical and mental healthcare.

172.     The inmates housed in the Broward County jail facilities have a clearly established constitutional right to receive immediate medical care for their serious medical needs.

173.     Accordingly, Defendant Sheriff Tony, and Wellpath Defendants are liable under the Fourteenth Amendment for the individual defendants' deliberate indifference to Kevin's serious medical needs which resulted in Kevin's conscious pain and suffering and later death.

**COUNT 9**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Failure to Train**
**(Defendants Gregory Tony, Wellpath LLC, and Wellpath Management Inc.)**

174.     Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 131-135, 139-142, and 143-149.

175.     The violations of Kevin's constitutional rights alleged above were committed by the individual defendants while they were acting on behalf of their respective employers, pursuant to the customs, practices, policies, and/or procedures of their respective employers.

176.     Defendant Tony has a responsibility to ensure that the employees, staff, and agents working in Broward County's jail facilities are qualified, credentialed, and adequately trained.

42

177.     Defendant Tony failed to train BSO employees, staff, and agents, including the individual defendants, on (1) use of force, including, but not limited to, tasers, pepper spray, and physical force used to handcuff an individual, (2) handcuffing an individual, (3) removing an individual from their cell, (4) restraining an individual in a restraint chair, (5) administering a chokehold, and (6) de-escalating the use of force after compliance is gained.

178.     Defendant Tony failed to train BSO employees, staff, and agents on how to respond to an individual having a mental health crisis and failed to ensure that they have the requisite knowledge, expertise, and experience to treat an individual who is having a mental health crisis.

179.     Defendant Tony failed to train BSO employees, staff, and agents on how to render emergency aid in a timely manner after an individual becomes unresponsive and failed to ensure that they have the requisite knowledge, expertise, and experience to treat an individual who needs emergency medical attention.

180.     Wellpath Defendants have a responsibility to train medical personnel in the Broward County jail facilities.

181.     Wellpath Defendants failed to train Wellpath employees, staff, and agents, including the individual defendants, on the provision of adequate mental health care, including, but not limited to, the provision of medication, response to an inmate refusing medication and meals, and response to an inmate exhibiting signs of declining mental health.

182. Wellpath Defendants failed to train Wellpath employees, staff, and agents on when to administer emergency aid in a timely manner after an individual becomes compliant or after an individual has been restrained.

183. Accordingly, Defendant Tony and Wellpath Defendants are liable under the Fourteenth Amendment for their failure to train the individual defendants, resulting in Kevin's conscious pain and suffering and later death.

**COUNT 10**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Failure to Supervise and Discipline**
**(Defendants Gregory Tony, Wellpath LLC, and Wellpath Management Inc.)**

184. Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 134-138, 139-142, and 143-149.

185. The violations of Kevin's constitutional rights alleged above were committed by the individual defendants while they were acting on behalf of their respective employers, pursuant to the customs, practices, policies, and/or procedures of their respective employers.

186. Defendant Tony has a duty to supervise his employees, staff, and agents to ensure that the rights of individuals being held in Broward County's jail facilities are protected.

187. Defendant Tony has a further responsibility to ensure that the employees, staff, and agents working in Broward County's jail facilities are disciplined when they violate the rights of individuals and fail to comply with practices, policies, and procedures.

188. Defendant Tony failed to supervise BSO employees, staff, and agents who were (1) using force on individuals, (2) removing individuals from their cells, (3)

44

restraining individuals in restraint chairs, (4) administering chokeholds, and (5) not de-escalating the use of force after gaining compliance.

189. Defendant Tony failed to supervise BSO employees, staff, and agents responding to individuals having a mental health crisis and rendering emergency aid.

190. Defendant Tony inadequately investigated and failed to discipline the individual defendants following Kevin's death.

191. Defendant Tony ignored or inadequately investigated prior constitutional violations involving the treatment of individuals with mental health conditions, individuals experiencing medical emergencies, and individuals subjected to excessive force, and failed to impose any discipline or adequate discipline on BSO employees, staff, and agents.

192. Wellpath Defendants have a responsibility to supervise medical personnel in the Broward County jail facilities.

193. Wellpath Defendants failed to supervise Wellpath employees, staff, and agents providing mental health care, including, but not limited to, administering medication, responding to inmates refusing medication and meals, and responding to inmates exhibiting signs of declining mental health.

194. Wellpath Defendants failed to supervise Wellpath employees, staff, and agents administering emergency aid after compliance is gained or after restraints are in place.

195. Wellpath Defendants ignored or inadequately investigated prior constitutional violations involving the treatment of individuals with mental health

conditions and individuals experiencing medical emergencies, and failed to impose discipline on Wellpath employees, staff, and agents after incidents.

196. Accordingly, Defendant Tony, and Wellpath Defendants are liable under the Fourteenth Amendment for their failure to supervise and discipline the individual defendants, resulting in Kevin's conscious pain and suffering and later death.

**COUNT 11**
**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – Supervisor Liability**
**(Defendant Gregory Tony)**

197. Plaintiff repeats and realleges every allegation of the Complaint.

198. Defendant Tony, as Sheriff of Broward County, was responsible for supervising Defendants Ryan Daniel, Angela McNeal, Kimberly Green, Christopher Williams, Devon Parker, and Jeremiah Howard.

199. At the time Defendants Daniel, McNeal, Green, Williams, Parker, and Howard used excessive force against Kevin, BSO's history of excessive force incidents placed Defendant Tony on notice of the urgent need to correct BSO's training, policies, and customs on use of force in the jail. Despite this notice, Defendant Tony failed to take corrective action to prevent future excessive force incidents.

200. His conduct was in whole or in part the moving force behind the Fourteenth Amendment violations that Kevin suffered at the hands of BSO staff.

201. Defendant Tony was also responsible for supervising all Wellpath staff, including Defendants Etude Petit-Homme Datus, and Jane Does #1-3.

46

202.     Wellpath's extensive history of providing inadequate mental health and medical care, leading to avoidable deaths and other serious injuries at Broward County Jail and other facilities, put Defendant Tony on notice of the need for corrective action. Despite this notice, Defendant Tony failed to take steps to correct Wellpath's constitutionally deficient healthcare provision.

203.     Accordingly, Defendant Tony is liable in his individual capacity for the violations of Kevin's Fourteenth Amendment rights committed by BSO and Wellpath staff under his supervision.

## COUNT 12
## 42 U.S.C. § 12101, *et seq.* - THE AMERICANS WITH DISABILITIES ACT (ADA)
### (Defendant Gregory Tony)

204.     Plaintiff repeats and realleges every allegation of the Complaint.

205.     BSO is a public entity that receives federal funding and is thus required to comply with the ADA, which protects individuals with disabilities. The ADA prohibits public entities from discriminating against individuals with disabilities in their services, programs, and activities.

206.     The ADA defines "a qualified individual with a disability" as a person who suffers from a "physical or mental impairment that substantially limits one or more major life activities" including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(1)(A), (2)(A).

207.     Kevin's bipolar disorder and schizoaffective disorder made him a "qualified individual with a disability" under the ADA. § 12102(1)(A), (2)(A).

208.	Under the ADA, BSO is required to provide the inmates with disabilities housed in its facilities with reasonable accommodations and modifications so that they can avail themselves of, and participate in, all of the programs and activities offered in the Broward County jail facilities.

209.	The majority of individuals suffering with mental illness in the jail are unable to participate in mental health programming like daily treatment programs and group treatment, or enough to receive out-of-cell time and recreation time and engage in social interactions and cell front interactions, depriving them of programs and conditions accessed by other inmates.

210.	BSO (1) failed to ensure that Kevin was provided with mental health assessments after January 14, 2021 in line with monitoring and treating his mental illness; (2) failed to ensure that Kevin received medication in line with treating his mental illness; (3) failed to provide access to safe, appropriate housing that would reduce Kevin's ability to self-harm; (4) failed to provide adequately trained staff to address Kevin's mental health needs; (5) failed to provide Kevin with out-of-cell programming due to this mental health status that they failed to treat; and (6) failed to transfer Kevin to another facility better equipped to handle his needs.

211.	Had BSO ensured that Kevin received adequate mental health treatment and was housed in a proper setting, or, alternatively, that Kevin was transferred to a facility that could provide adequate mental health treatment, Kevin's mental health would not have further deteriorated.

212.     As a direct result of BSO's failure to reasonably accommodate Kevin by providing adequate mental health treatment and services as required by the ADA, he experienced pain and suffering and later death.

213.     Accordingly, BSO is liable under the ADA for its failure to provide adequate mental health treatment and services, mental health programming, proper accommodations, safe housing, and adequately trained staff.

**COUNT 13**
**SECTION 504 OF THE REHABILITATION ACT (RA)**
**(Defendant Gregory Tony)**

215.     Plaintiff repeats and realleges every allegation of the Complaint.

216.     BSO is a public entity that receives federal funding and is thus required to comply with Section 504 of the RA, which prohibits discrimination against persons with disabilities by any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a), (b)(1).

217.     Kevin's bipolar disorder and schizoaffective disorder made him a qualified individual with a disability under the RA. 29 U.S.C. § 705(20), (21).

218.     BSO (1) excluded Kevin from participation in, and denied him the benefits of, programs or activities solely by reason of his disability (bipolar disorder and schizoaffective disorder); (2) subjected him to discrimination; and (3) denied him the opportunity accorded to others to participate in programs and activities. 29 U.S.C. § 794(a).

219.     BSO utilized criteria or methods of administration that either purposefully or in effect discriminate on the basis of mental illness, and defeat or substantially impair accomplishment of the objectives of Broward County jail facilities'

programs or activities with respect to individuals with mental illness. 28 C.F.R. § 42.503(b)(3).

220.     The majority of individuals suffering with mental illness in the jail are unable to participate in mental health programming like daily treatment programs and group treatment, or enough to receive out-of-cell time and recreation time and engage in social interactions and cell front interactions, depriving them of programs and conditions accessed by other inmates.

221.     BSO knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to Kevin's constitutional and statutory rights.

222.     As a result of BSO's exclusion, discrimination, and denial of opportunities, Kevin experienced pain and suffering and later death.

223.     Accordingly, Defendant Tony is liable under the RA for violating Kevin's constitutional and statutory rights.

**COUNT 14**
**Wrongful Death - Fla. Stat. §§ 768.16-.26 and 768.28**
**(Defendants Ryan Daniel, Angela McNeal, Kimberly Green, Christopher Williams, Devon Parker, and Jeremiah Howard)**

214.     Plaintiff repeats and realleges every allegation of the Complaint, particularly ¶¶ 16-60, 61-85, 86-97, 99-133, 139-142, and 136-139.

215.     On the night of January 17, Kevin was incarcerated in NBB and in the custody of BSO.

216.     Defendants Daniel, McNeal, Green, Williams, Parker, and Howard were acting within the scope of their employment at BSO at all times on the night of

January 17, including when they used excessive force on Kevin and delayed providing or seeking medical treatment for Kevin.

217.    Prior to the attempted removal from his cell, Kevin was handcuffed by Defendant Daniel.

218.    By detaining and attempting to remove Kevin from his cell, Defendants Daniel, McNeal, Green, Williams, Parker, and Howard effectively placed Kevin under their custody and care.

219.    While in their custody and care, all six individual defendants proceeded to physically assault handcuffed-Kevin.

220.    Throughout this violent relocation process, each of the individual defendants, collectively and individually, placed Kevin in danger of severe harm by assaulting him and allowing each other to assault him while in a vulnerable state created by their detainment.

221.    Even after Kevin was visibly weak and partially and/or fully secured to a restraint chair, Defendants Williams and Howard took turns administering chokeholds to Kevin, and Defendants Daniel, McNeal, Green, and Parker allowed such dangerous maneuvers to be administered.

222.    Defendants owed Kevin a special duty of care from the moment they handcuffed him.

223.    Defendants acted unreasonably by subjecting Kevin to such attacks while he was partially and/or fully restrained, thereby breaching the duty owed to Kevin.

224.    Additionally, Defendants Daniel, McNeal, Green, Williams, Parker, and Howard's actions were not initiated for the protection of the general public. While

in his cell, Kevin was not a public safety concern, nor could he reasonably be said to be a risk to others.

225. Defendants were at all times aware of Kevin's serious and persistent mental illness and his need for substantial medical attention and observation.

226. Defendants decided to take action in an attempt to protect Kevin from harming himself, thereby attempting to provide medical assistance.

227. By deciding to medically intervene, Defendants should have taken care to not exacerbate Kevin's injuries, much less add to them.

228. Defendants did seek assistance from medical personnel to provide medical treatment to Kevin or assist in Kevin's safe removal from his cell, nor did Defendants provide medical assistance to Kevin themselves.

229. Instead, Defendants forcibly removed Kevin from his cell, dragged him across the floor, and pinned him to the ground while using excessive force–tasing him, pepper spraying him, punching him, and putting all of their weight on him.

230. Even after Kevin had been partially restrained and was noticeably too weak to be a threat to any other persons, Defendants continued to administer a chokehold on Kevin for several minutes.

231. Even after Kevin had clearly fallen unconscious, Defendants failed to immediately administer CPR, leaving him unconscious for over four minutes before doing so.

232. Defendants' attempts to provide medical assistance at this point actually placed Kevin at a greater risk of harm than when he was alone in his cell.

233.   Had Defendants immediately sought medical personnel to provide medical assistance, provided medical aid themselves, or assisted medical personnel in administering medical aid, Kevin could have gotten the help he needed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that after due proceedings there be judgment rendered herein in Plaintiff's favor and against all Defendants, individually and jointly, as follows:

a.   Compensatory and punitive damages as prayed for herein;

b.   Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794(b) and all costs of these proceedings;

c.   Punitive damages pursuant to 42 U.S.C. § 1983 and any other applicable statute;

d.   Relief under Fla. Stat. §§ 768.16-.26 and 768.28; and

e.   All other relief as appears just and proper to this Honorable Court.

Dated: August 25, 2023

Respectfully submitted,

**AsiliA Law Firm, P.A.**

/s/Jeremy McLymont
Jeremy McLymont, Esq.
33SW 2nd Ave. Suite 1100
Miami, FL 33130
Tel. (786) 420-3014
Jeremy@asilialaw.com
Florida Bar No. 1010776

**National Police Accountability Project**

Lauren Bonds*
1403 Southwest Boulevard
Kansas City, Kansas 66103
(620) 664-8584
legal.npap@nlg.org
Kansas Bar No. 27807

53

Texas Bar No. 24090504

Keisha James*
PO Box 56386
Washington, DC 20040
(202) 557-9791
keisha.npap@nlg.org
DC Bar No. 1658974
New York Bar No. 5709449

Eliana Machefsky*
2111 San Pablo Avenue
PO Box 2981
Berkeley, CA 94702
(314) 440-3505
fellow.npap@nlg.org
California Bar No. 342736

* admitted *pro hac vice*

**ATTORNEYS FOR PLAINTIFF**