UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 23-cv-60499-SINGHAL/STRAUSS**

**MIKECO DESIR**,
*o/b/o of Kevin Desir, Deceased*,

      Plaintiff,

v.

**SHERIFF GREGORY TONY** et al.,

      Defendants.

_____/

## OMNIBUS ORDER ON MOTIONS TO EXCLUDE OR LIMIT TESTIMONY OF CERTAIN EXPERT WITNESSES

**THIS MATTER** came before the Court upon Defendants' Motion to Strike Plaintiff's Rebuttal Expert or Limit Testimony [DE 122], Defendants' *Daubert* Motion to Exclude the Opinions and Expected Expert Testimony of Dr. David Macpherson [DE 162], Defendants' *Daubert* Motion to Exclude the Opinions and Expected Expert Testimony of Patrick Hurley [DE 163], Defendants' *Daubert* Motion to Limit and Exclude the Opinion and Expected Expert Testimony of Dr. Daniel Schultz [DE 164], Plaintiff's Motion to Exclude the Testimony and Report of Defendants' Expert Mark Shuman [DE 165], and Plaintiff's Motion to Exclude the Testimony and Report of Defendants' Expert Aubrey Land [DE 166] (collectively, the "Motions"). The Motions have been referred to me, pursuant to 28 U.S.C. § 636(b)(1)(A) and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, to take all action as required by law. *See generally* [DE 227]. I have reviewed the Motions, respective Responses, respective Replies (if applicable), and all other pertinent portions of the record. The Court rules as follows.

## BACKGROUND

Plaintiff Mikeco Desir ("Plaintiff") brings this action on behalf of his deceased brother, Kevin Desir ("Mr. Desir"). *See generally* [DE 113]. Plaintiff's claims arise out of the allegedly wrongful actions of multiple parties preceding Mr. Desir's death while he was in custody at Broward County's North Broward Bureau Jail. Plaintiff brings multiple claims, including ones under 42 U.S.C. § 1983 for the alleged use of excessive or unreasonable force in violation of the Fourteenth Amendment. *See id.* at 33-61. According to the Second Amended Complaint, Mr. Desir had been arrested for possessing marijuana in January 2021. [DE 113] at 2. After being in custody for around four days, Mr. Desir had a mental health "episode" in his cell. *Id.* He was naked and appeared to have cut himself. *Id.* ¶ 37. Following a succession of escalating events after staff in the jail began to intervene, Mr. Desir became unresponsive, was transported to a hospital, and eventually died.

Some of the key issues in the case include: (1) Mr. Desir's cause of death, (2) the reasonableness of the force used by law enforcement personnel against Mr. Desir, and (3) the amount of financial support and household services that Mr. Desir's minor daughters lost because of their father's passing. The parties have engaged experts to opine on these issues at trial. Consequently, the parties have filed motions to exclude or limit the testimony of the opposing side's experts for failure to comply with the requirements of Federal Rule of Evidence 702, which addresses testimony by expert witnesses, and other rules. Specifically, Defendants Gregory Tony, in his capacity as Sheriff of Broward County, Ryan Daniel, Angela McNeal, Devon Parker, Jeremiah Howard, Kimberly Green, and Christopher Williams (collectively, "Defendants") seek to exclude or limit the testimony of Plaintiff's experts on cause of death, use of force, and lost

support and services.  On the other hand, Plaintiff seeks to exclude Defendants' experts on cause of death and use of force.  The Court addresses the admissibility of each expert below.

## LEGAL STANDARD

"Under Rule 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant."  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  A district court's inquiry, however, is a flexible one.  *Daubert*, 509 U.S. at 594.  Still, for an expert's testimony to be admissible, a party must demonstrate that the following elements are satisfied— by a preponderance of the evidence:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Eleventh Circuit has streamlined this analysis into a three-part test that the proponent of the expert must satisfy: (1) the expert is qualified to testify on the matter to be addressed; (2) the expert's methodology is sufficiently reliable; and (3) the proposed expert testimony would be helpful to the jury.  *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 563 (11th Cir. 1998)).  While an analysis of these elements may necessarily entail some overlap, the concepts of qualification, reliability, and fit or helpfulness are nonetheless distinct and should not be conflated.  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The proponent of expert testimony always bears the burden

to show that his expert is qualified to testify competently regarding the matters he intended to address; the methodology by which the expert reached his conclusions is sufficiently reliable; and the testimony assists the trier of fact." (citation modified)); *GS Holistic, LLC v. Mr. Smokey Corp.*, No. 23-20599-CV, 2024 WL 4653788, at *1 (S.D. Fla. June 5, 2024) ("The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence.").

In exercising its gatekeeping role, a court should not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341. Instead, a court should merely analyze the methodology of the expert at issue. *Id.*; *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). This limited focus is because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. In other words, the gatekeeper role of the court "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Maiz*, 253 F.3d at 666).

## ANALYSIS

### I.    UNTIMELY DISCLOSURE OF DR. DANIEL SCHULTZ

Dr. Daniel Schultz is a forensic pathologist. [DE 164] at 2; [DE 176] at 1. Plaintiff seeks to use Dr. Schultz as both an affirmative expert witness on the medical cause of Mr. Desir's death and as a rebuttal expert to rebut the opinions and conclusions of Defendants' cause-of-death expert, Dr. Mark Shuman. [DE 128] at 5-6. Defendants filed two motions regarding Dr. Schultz. *See generally* [DE 122]; [DE 164]. First, Defendants have moved to limit the use of Dr. Schultz's opinions as an affirmative expert because Plaintiff did not timely disclose him. [DE 122] at 1-5.

4

Second, Defendants have moved to limit Dr. Schultz's testimony at trial so that he cannot provide his subjective interpretation of the surveillance footage for the jury.  [DE 164] at 2-7.  The Court addresses the motion to exclude Dr. Schultz for his untimely disclosure first.  The Court will address the latter motion targeted at Dr. Schultz when it addresses Plaintiff's motion to exclude or limit the testimony of Dr. Shuman, as there is some overlap between the two motions.

Plaintiff and the rest of Mr. Desir's family initially engaged Dr. Schultz to perform an autopsy of Mr. Desir the day after he passed away, which was before the county medical examiner released any findings and conclusions.  [DE 128] at 9-10; [DE 128-2] at 1.  At that time, Plaintiff and the family of Mr. Desir had not hired Dr. Schultz to provide expert testimony in this case. [DE 128] at 10; [DE 128-2] at 1.  Dr. Schultz then performed an autopsy of Mr. Desir on January 31, 2021, documenting his findings in an autopsy report.  [DE 128] at 4.  He concluded that Mr. Desir died from manual strangulation.  [DE 164] at 2.  Dr. Schultz also watched the surveillance footage of the incident, which informed or confirmed his conclusions regarding Mr. Desir's cause of death.  [DE 176] at 1, 4.

During discovery, Plaintiff included Dr. Schultz in his initial disclosures to Defendants on October 26, 2023.  [DE 128] at 3.  Plaintiff later produced Dr. Schultz's autopsy report to Defendants on November 3, 2023.  *Id.*  On June 10, 2024, counsel for co-defendants in the case deposed Dr. Schultz.  *Id.*  However, according to Defendants, at both the expert disclosure deadline on July 3, 2024, and amended expert disclosure deadline on August 5, 2024, Plaintiff neglected to disclose Dr. Schultz as an affirmative expert.  [DE 122] at 2-3.  Defendants inquired about the omission but did not receive a response.  [DE 122] at 2, 4; [DE 122-2] at 1.  Yet Plaintiff did timely include Dr. Schultz as a rebuttal expert on August 19, 2024, which was two weeks after the affirmative expert disclosures were ultimately due.  [DE 122] at 3; [DE 128] at 4-5.  Defendants

deposed Dr. Schultz on October 7, 2024, for what was Dr. Schultz's second deposition in the case. *See* [DE 128] at 5; [DE 164-2] at 1, 88-101.

Defendants move to strike or limit Dr. Schultz's August 19, 2024 Report (and related opinions or expert testimony) on Mr. Desir's cause of death from Plaintiff's case in chief because it was disclosed at the rebuttal report deadline rather than the prior expert report deadlines. [DE 122] at 3.  Further, Defendants state that the opinions in the August 19, 2024 Report should only be used to rebut the opinions of Defendants' cause-of-death expert, Dr. Shuman.  *Id.* Defendants expressly made this argument in a pretrial motion rather than a motion in limine—but Defendants also noted potential plans to include the argument in a later motion in limine.[1] [DE 122] at 1-2.  Plaintiff responded to the pretrial motion by stating that (to the extent that he was required to disclose Dr. Schultz as an affirmative expert) any untimely disclosure was an oversight, and Defendants were not harmed or prejudiced by the oversight because Defendants had known about Dr. Schultz (and his opinions on cause of death) long before the expert report deadlines. [DE 128] at 3-4, 7.  To support his argument, Plaintiff notes that he listed Dr. Schultz in his initial disclosures and had produced Dr. Schultz's autopsy report over half a year prior to the initial expert disclosure deadline.  *Id.* at 3.  Plaintiff also notes that Dr. Schultz had been deposed by co-defendants in the case prior to the relevant deadlines, and the deposing co-defendants indicated through questioning that they understood Dr. Schultz to be testifying as an expert witness in the case.  *Id.* at 3-4; [DE 128-1] at 1.  According to Plaintiff, both Dr. Schultz's autopsy report and deposition testimony contained his opinions on Mr. Desir's cause of death.  *Id.* at 4.  The Court

---

[1] On the other hand, Defendants' later *Daubert* motion targeted at Dr. Schultz "does not attempt to have his testimony barred whole cloth, or even exclude his medical opinion [about] Mr. Desir's cause of death . . . ." [DE 164] at 2.

concludes that Defendants were not prejudiced by any supposed untimely disclosure and will not limit Dr. Schultz's opinions or testimony on this basis.

"Rule 37 gives a trial court discretion to decide how best to respond to a litigant's failure to make a required disclosure under Rule 26." *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 593 (11th Cir. 2019).  Under Rule 37(c)(1), a party who fails to disclose information or witnesses required by Rule 26 may be permitted by the Court to still use that information or witness if "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  "Substantially justified means that reasonable people could differ as to the appropriateness of the contested action." *Knight through Kerr v. Miami-Dade County*, 856 F.3d 795, 811-12 (11th Cir. 2017) (quoting *Maddow v. Procter & Gamble Co.*, 107 F.3d 846, 853 (11th Cir. 1997)).  Harmless means that "there is no prejudice to the party entitled to receive the disclosure." *Lucibella v. Ermeri*, No. 20-CV-82156, 2024 WL 3817383, at *2 (S.D. Fla. Aug. 14, 2024) (quoting *Northrup v. Werner Enter., Inc.*, No. 14-CV-1627-T-27, 2015 WL 4756947, at *1 (M.D. Fla. Aug. 11, 2015)).

Here, insofar as Defendants still seek relief from this motion [DE 122], the Court finds that any delay by Plaintiff in disclosing Dr. Schultz as an expert witness was harmless, as Defendants seemingly concede that they were not prejudiced considering Plaintiff's Response [DE 128] and the Court's Second Amended Scheduling Order [DE 133].[2]  [DE 134] at 1.  Even without the apparent concession, the Court finds that any untimely disclosure did not prejudice Defendants, given their ample notice of Dr. Schultz's involvement in the case and opportunities to depose him. Further, preventing Plaintiff from relying on Dr. Schultz's testimony regarding Mr. Desir's cause of death—a foundational issue in the case—would be an overly harsh sanction for Plaintiff's oversight, as Defendants have, according to Plaintiff, been aware of Dr. Schultz's opinions since

---

[2] The Court later extended discovery deadlines again, further minimizing any prejudice.  *See, e.g.*, [DE 142].

relatively early in the case.  *Cf. Predelus v. Atain Specialty Ins. Co.*, No. 21-23382-CIV, 2022 WL 11202228, at *3 (S.D. Fla. Oct. 19, 2022) ("Striking Mr. Charles' report under the circumstances of this case would be an excessive sanction given that neither the delay nor the deficiencies of the disclosures amounted to substantive harm to Defendant.").  The motion [DE 122] is due to be denied.

## II.   DR. MARK SHUMAN

Dr. Shuman is a board-certified forensic pathologist whom Defendants hired to opine on Mr. Desir's cause of death.  [DE 175] at 2.  Unlike Dr. Schultz and the county medical examiner, Dr. Shuman did not examine Mr. Desir's body.  [DE 165] at 1.  Dr. Shuman instead formed his opinion based on, among other things, the prior autopsy reports, Mr. Desir's medical records, autopsy photos, and the video footage of the incident.  [DE 165] at 1-2; [DE 175] at 2.

Dr. Shuman disagrees with Dr. Schultz's opinion that Mr. Desir died from manual strangulation.  [DE 175] at 4.  Dr. Shuman instead believes that Mr. Desir's death resulted from "an episode of psychosis" while being restrained.  [DE 175] at 2; [DE 165-1] at 3-5.  Dr. Shuman also used the term "Excited Delerium Syndrome" to describe this contrary cause-of-death opinion in his report, which Dr. Shuman himself noted is a term that has "fallen out of favor" in the medical community.  [DE 165-1] at 3-4.  Yet Dr. Shuman's report also indicates that numerous syndromes have similar presentations, and he believes that the exact wording of the diagnosis does not make a difference because "death during psychosis is a known phenomenon and occurs in the absence of restraint and occasionally after successful restraint."  *Id.* at 4.  As explained by Dr. Shuman at his deposition, an increased release of catecholamines from undergoing a psychotic episode, combined with the increased release of catecholamines that one would expect from fighting against restraint, puts one at a higher risk of cardiac arrhythmia and thus cardiac arrest.  [DE 175-1] at 41-

42.  Therefore, in Dr. Shuman's opinion, excited delirium, psychosis, or any other phrase meaning generally the same idea is what, in addition to restraint, caused Mr. Desir's death.  [DE 175-1] at 37-43.

Dr. Shuman's disagreement with Dr. Schultz's opinion—that manual strangulation or neck compression led to the lack of oxygen in Mr. Desir's brain and subsequent death—relies on a few key premises.  For example, Dr. Shuman's report and deposition testimony indicate that death by manual strangulation requires complete compression of the key arteries in one's neck for ten to fifteen seconds to cause a person to lose consciousness, followed by continued compression for at least a couple minutes to cause death.  [DE 165-1] at 5; [DE 175-1] at 65-66.  Dr. Shuman's deposition testimony also indicates that a person who has lost consciousness would lack movement.  [DE 175-1] at 72, 80-81.  Dr. Shuman's disagreement with Dr. Schultz boils down to his application of these premises to his own observations when watching the video footage.  *See id.* at 71.  According to Dr. Shuman, the footage does not show any hands being placed on Mr. Desir's neck for a period long enough for Mr. Desir to have died by manual strangulation.  *Id.*  Dr. Shuman observed from the video that the officer did not always have his hands on Mr. Desir's neck during the necessary period, *id.* at 94-95, and that Mr. Desir did not seem to lose consciousness at a time that would "make sense" for the death to have resulted from manual strangulation, *id.* at 71.  Yet Dr. Shuman admitted that Dr. Schultz would be correct if Mr. Desir's neck was compressed for more than three minutes and Mr. Desir lost consciousness early in that time.  *Id.*

Plaintiff's *Daubert* motion targeted at Dr. Shuman primarily challenges the reliability of Dr. Shuman's opinions rather than his qualifications to provide expert testimony or the helpfulness to the jury of his opinions.  Plaintiff first argues that Dr. Shuman's opinion is unreliable because

he bases it on facts that he does not know or incorrectly perceives. [DE 165] at 3-6. Plaintiff next argues that Dr. Shuman's opinions are unreliable and should be excluded because his methodology to determine the cause of death is unsupported. *Id.* at 6-7. Plaintiff's third argument is that Dr. Shuman's opinion is unreliable because it relies on a diagnosis that is no longer generally accepted in the medical community. *Id.* at 7-9. Plaintiff's final argument concerns the helpfulness of Dr. Shuman's interpretation of the video footage via a timeline included in his report. *See id.* at 9-10. Plaintiff asserts that Dr. Shuman should not be allowed to use the timeline in his report that describes the events that occurred in the footage because it resolves factual matters for the jury and is inaccurate. *Id.* The Court addresses each argument in turn.[3]

### A. Reliability

#### i. Whether Dr. Shuman relies on unsupported factual assumptions

In Plaintiff's view, Dr. Shuman's opinion that Mr. Desir did not die from manual strangulation is unreliable and should be excluded because the conclusion was based on several facts he did not know and made unfounded assumptions regarding. [DE 165] at 3-4. Plaintiff elaborates that the unknown and unsupported facts relied on by Dr. Shuman include when Mr. Desir lost consciousness, when Mr. Desir lost a pulse, and when Mr. Desir's neck arteries were being compressed. *Id.* Plaintiff stresses that these facts cannot be determined by simply watching the video footage, so this portion of Dr. Shuman's opinion should be excluded. *Id.* at 4-6. Defendants respond that Plaintiff misconstrues Dr. Shuman's methodology as requiring exact

---

[3] Both sides essentially seek to preclude each other's expert from testifying regarding observations from the video footage. *Compare* [DE 164] at 5 ("Dr. Schultz should not be permitted to testify as to his opinion of what the video surveillance depicts."), *with* [DE 165] at 9 ("[Dr.] Shuman's timeline, which purports to summarize a series of events that he witnessed on the video, invades the province of the jury by telling it what it should see and when."). The Court, therefore, will address Defendants' motion [DE 164] to limit the testimony of Dr. Schultz regarding the footage at the same time it addresses Plaintiff's similar motion directed at Dr. Shuman.

knowledge of these facts when it does not.  [DE 175] at 5-7.  Defendants also respond that Dr. Shuman bases his opinion on a sufficient factual basis, and any reliance on a conflicted view of the facts is an issue going to the weight of the testimony rather than its admissibility.  *Id.* at 6-7. Except for the portions of Dr. Shuman's opinion stating when Mr. Desir lost a pulse, Defendants are correct.

"An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record."  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). Likewise, "an expert witness is entitled to rely upon disputed facts so long as those facts find support in the record."  *Guzman v. Holiday CVS, LLC*, No. 21-23021-CIV, 2022 WL 10043004, at *2 (S.D. Fla. Oct. 17, 2022); *see also Daubert*, 509 U.S. at 590 (requiring subject of expert testimony to be more than "subjective belief or unsupported speculation").  Where an expert's opinion does find some factual support in the record, "[a]ny weaknesses in the factual underpinnings of [the expert's] opinion go to the weight and credibility of his testimony, not to its admissibility."  *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015) (quoting *Hurst v. United States,* 882 F.2d 306, 311 (8th Cir. 1989)) (second alteration in original).

Here, Plaintiff's argument—that Dr. Shuman's opinion is unreliable because he cannot identify critical facts—fails primarily because it misconstrues Dr. Shuman's methodology. Plaintiff indicates that, under Dr. Shuman's methodology, knowing facts like when Mr. Desir lost consciousness or lost a pulse are "essential to his analysis."  [DE 165] at 2.  But as Defendants point out, Dr. Shuman's opinion does *not* require undisputed knowledge of these facts.  [DE 175] at 6-7.  Rather, Dr. Shuman's opinion is based on a few key premises that can ultimately be applied to observations from the video footage: (1) a loss of consciousness occurs after around ten to fifteen seconds of complete compression of the carotid arteries (i.e., where blood flow to the brain is fully

restricted); (2) after a loss of consciousness, one must sustain compression on the carotid arteries for at least another couple of minutes to cause death; and (3) someone cannot have lost consciousness if they are actively moving or resisting.  [DE 175-1] at 93-96; *see* [DE 165-1] at 5.

Applying these premises, Dr. Shuman notes that "[t]here is no 10 to 15 second period during the restraint where the corrections officer's hands were on his neck prior to when he stopped resist[ing] or appeared to have lost consciousness."  [DE 165-1] at 5.  Dr. Shuman also notes that the officer's hands came off Mr. Desir's neck "multiple times."  [DE 175-1] at 96.  Critically, under Dr. Shuman's approach, the continued compression *after* a loss of consciousness cannot occur if Mr. Desir is still moving or resisting and thus *not* unconscious.  Dr. Shuman used the point at which Mr. Desir stops moving or resisting in the footage as the earliest point that Mr. Desir could have been unconscious while also recognizing the unconsciousness could have occurred even later.  *Id.* at 80-81.  Because nobody appears to keep their hands on Mr. Desir's neck for a period of at least two minutes after Mr. Desir stops moving, Dr. Shuman concludes that manual strangulation cannot be the cause of death.  In other words, according to Dr. Shuman, this cause of death has a few necessary conditions, and those necessary conditions never occurred.  Contrary to Plaintiff's position, this analysis does not require knowledge of the exact amount of compression occurring on the carotid arteries because Dr. Shuman arrives at his conclusion even assuming complete compression occurs whenever the officer's hands are on Mr. Desir's neck.  *See* [DE 165-1] at 5.  Because Dr. Shuman is relying on his observations from the video footage itself to see if the necessary conditions for death by manual strangulation occurred, his conclusion is based on sufficient factual support in the record.  *See McLean*, 224 F.3d at 801; *Guzman*, 2022 WL 10043004, at *2.

In addition, whether the footage supports Dr. Shuman's identification of the points when certain events occurred—or whether the totality of evidence suggests that Mr. Desir lost consciousness and had his carotid arteries compressed at different points—is for the jury to decide. An opinion is not excludable for being based on a particular version of disputed facts. *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1265 (S.D. Fla. 2012) ("An expert is . . . permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded to that opinion is for the jury." (alteration in original) (quoting *Walker v. Gordon*, 46 F. App'x 691, 695-96 (3d Cir. 2002))). Whether Dr. Shuman relied on an incorrect view of the facts goes to the weight of the testimony, not its admissibility. *See Sorrels*, 796 F.3d at 1285.

Even so, Dr. Shuman does concede that he cannot determine when Mr. Desir lost a pulse from the footage. [DE 175-1] at 98-99. Although Mr. Desir's supposed loss of a pulse is included as an additional basis in Dr. Shuman's report to conclude that "compression of [Mr. Desir's] neck did not result in the cardiopulmonary arrest[,]" knowing when Mr. Desir lost a pulse is not necessary for Dr. Shuman to rule out manual strangulation as the cause of death under his methodology. Even if Dr. Shuman has no sufficient basis in the record to determine when Mr. Desir lost a pulse, the analysis that there was no sustained compression for a sufficient period after a loss of movement or resistance, which Dr. Shuman states is the earliest time when Mr. Desir could have lost consciousness, still can independently rule out manual strangulation as the cause of death under Dr. Shuman's methodology. So the lack of knowledge of this fact does not undermine Dr. Shuman's overall opinion.

In sum, Dr. Shuman's inability to pinpoint the exact moments where there was a loss of consciousness, a loss of a pulse, or a complete compression of Mr. Desir's arteries does not undermine Dr. Shuman's core analysis and conclusion. Dr. Shuman's testimony will not be

generally excluded on this basis.  However, Dr. Shuman cannot testify as to when Mr. Desir lost a pulse because his analysis on this point lacks adequate support in the record.

### ii.   Whether Dr. Shuman's analysis relies on a faulty methodology

Plaintiff argues that "[Dr.] Shuman's method for determining whether Mr. Desir died by strangulation is not reliable because measuring the time between compression of carotid arteries and loss of consciousness is not a reliable method for determining whether strangulation causes cerebral asphyxia."  [DE 165] at 6.  As alluded to above, this framing partially misconstrues the true nature of Dr. Shuman's analysis and thus does not persuade the Court that Dr. Shuman's opinion should be excluded on this basis.  However, Plaintiff also takes issue with the supposed sources that Dr. Shuman relied on for his assertion that complete compression of both carotid arteries will result in one losing consciousness in around ten to fifteen seconds.  *Id.*  Plaintiff thinks that this assertion lacks adequate support, making the opinion unreliable.  [DE 165] at 6-7.  In addition, Plaintiff claims that Dr. Shuman "failed to note that he relied on his education, training, or experience to determine the time it takes to lose consciousness due to carotid artery compression."  [DE 165] at 6.  Defendants respond that Dr. Shuman reliably based his methodology on "experimentation" that had been conducted[4] on volunteers, prior literature that Dr. Shuman did not re-review to make the opinion, and his own training and experience.  [DE 175] at 7-8.

As explained earlier, the Court's gatekeeping responsibilities require it to do more than simply take the expert's word for it when assessing whether the chosen methodology is reliable. *Frazier*, 387 F.3d at 1261.  The proponent of the expert must show that the methodology is

---

[4]  Dr. Shuman's deposition testimony does not make clear who exactly conducted the experimentation.

sufficiently reliable for the expert opinion to be admissible. *Phillips v. Am. Honda Motor Co.*, 238 F. App'x 537, 540 (11th Cir. 2007) (citing *id.* at 1260).  Showing sufficient reliability requires that one's expert do more than state that he used the "scientific method" to reach his conclusions. *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014).  Likewise, although an expert witness's experience (or training) can be a sufficient basis for expert testimony, *Jones v. Webb*, 516 F. App'x 762, 765 (11th Cir. 2013), "an expert cannot rely on 'experience' without explaining in detail how the experience and other materials consulted support the opinion rendered." *Umana-Fowler*, 49 F. Supp. 3d at 1122 (citing *Frazier*, 387 F.3d at 1265).

Here, Plaintiff's argument that Dr. Shuman's opinion is unreliable for failing to cite a specific study for the assertion that it takes ten to fifteen seconds of compression to cause a loss of consciousness is unavailing.  The Court finds it clear that Dr. Shuman was reliably drawing on his experience and training, along with his familiarity with prior studies and literature, even if he did not specifically cite them by name or re-review them to form his opinion in this matter.  Moreover, contrary to Plaintiff's contention, Dr. Shuman stated in his report that "[a]ll opinions are to a reasonable degree of medical certainty based on [his] education, training, and experience." [DE 165-1] at 5.  Dr. Shuman's deposition testimony similarly makes clear that his assertion regarding the duration of time it takes for complete compression of the carotid arteries to cause a loss of consciousness is based on his "experience and past readings." [DE 175-1] at 91.

The Court also finds that Dr. Shuman does more than just claim reliance on his experience and training alone—without any explanation or support—to conclude that Mr. Desir did not die from manual strangulation.  *See Umana-Fowler*, 49 F. Supp. 3d at 1122.  Dr. Shuman instead explains that the literature and experimentation previously reviewed by him indicate that a loss of consciousness occurs in around ten to fifteen seconds of complete compression of the carotid

arteries.  This premise is not rendered unreliable and excludable purely because Dr. Shuman did

not cite the independent studies or review them again before making his opinion.  *See Greene v.*

*Bd. of Regents of Univ. Sys. of Ga.*, No. 4:21-CV-277, 2023 WL 5837501, at *12 (S.D. Ga. Sept.

8, 2023) ("While experts frequently base their opinions on professional research or literature,

"[t]here is no inherent requirement that a medical expert cite or reference independent studies that

support [his or] her conclusions." (alterations in original) (quoting *Smith v. Bama Urgent Med.,*

*Inc.*, No. 08-CV-1546, 2011 WL 8635359, at *4 (N.D. Ala. July 20, 2011))).  Dr. Shuman

adequately explains in his report and deposition testimony how he applied this premise on loss of

consciousness to his observations from the video footage, which helped form his conclusion that

manual strangulation was not the cause of Mr. Desir's death.

Notably, Plaintiff's cause-of-death expert, Dr. Schultz, alluded to what these loss-of-

consciousness studies could be during his second deposition on October 7, 2024, explaining that

older experimentation was done on dogs and prisoners or mentally ill people.  [DE 164-2] at 73.

Dr. Schultz stated that "when it comes to humans and how long it takes to die without oxygen,

there are no studies other than ones that happened during [older] times like that . . . ."  *Id.*  But a

lack of extensive or more modern literature in a field is not automatically enough of a reason to

exclude testimony for being unreliable.  *See Schenone v. Zimmer Holdings, Inc.*, No. 3:12-CV-

1046-J-39MCR, 2014 WL 9879924, at *11 (M.D. Fla. July 30, 2014) ("Where there are other

factors that demonstrate the reliability of the expert's methodology, an expert opinion should not

be excluded simply because there is no literature on point." (quoting *Schneider ex rel. Est. of*

*Schneider v. Fried*, 320 F.3d 396, 406 (3d Cir. 2003))).

Any criticism that Plaintiff and his expert may have regarding Dr. Shuman's reliance or

lack of reliance on certain sources goes to the weight that the testimony should be afforded by the

jury, and Plaintiff is free to cross-examine Dr. Shuman on this issue to discredit his ultimate opinion. However, the Court will not exclude the testimony on this basis.

### iii.  Whether Dr. Shuman's opinion is based on an unreliable diagnosis

According to Plaintiff, Dr. Shuman's opinion and testimony consisted of stating that Mr. Desir was in a state of "excited delirium," a cause of death or diagnosis that is no longer generally accepted in the medical community. [DE 165] at 7. Plaintiff insists that, even though Dr. Shuman stated he was expressly not claiming excited delirium syndrome as a diagnosis or cause of death, Dr. Shuman's use of different terminology for the same flawed diagnosis just because of the backlash against it does not eliminate the problem: "the clinical condition only describes signs and symptoms rather than identifying underlying etiologies." *Id.* at 8. By contrast, Defendants argue that Dr. Shuman did not opine that Mr. Desir was in a state of excited delirium and did not base his findings on such a diagnosis. Defendants reiterate that Dr. Shuman's opinion is that "Mr. Desir's psychotic state, as well as the restraint, caused his death." [DE 175] at 9.

The Court rejects Plaintiff's argument regarding excited delirium syndrome. Although Plaintiff notes that "excited delirium" is a term that has faced some recent backlash from the medical community, Dr. Shuman explained that he was not using that term *precisely because* it had "fallen out of favor." [DE 165-1] at 3-4; [DE 175-1] at 38. Indeed, Dr. Shuman himself acknowledges that one of the issues with the term is that "there's no uniform definition of it." [DE 175-1] at 38. However, he asserted that the overall idea regarding the effects of psychosis—i.e., that psychosis, along with the brain-chemical reaction to it, could contribute to cardiac arrhythmia and later cardiac arrest—still held. In his report, Dr. Shuman even mentioned other accepted syndromes or diagnoses that have similar presentations in people. *See* [DE 165-1] at 3-4.

Put bluntly, nothing in Plaintiff's motion undermines Dr. Shuman's medical explanation that the increased release of catecholamines from undergoing a psychotic episode, combined with the increased release of catecholamines that one would expect from fighting against restraint, puts one at a higher risk of cardiac arrhythmia.  *See* [DE 175-1] at 41.  Although Dr. Shuman said during his deposition that one could possibly die from excited delirium syndrome alone, he is asserting in this case that Mr. Desir's state of psychosis was an "additive feature," combined with Mr. Desir's reaction to being restrained, that caused Mr. Desir's death.  *Id.* at 40-42.

Whilst Plaintiff cites authorities that seemingly support a move away from the "excited delirium" terminology, he does not present specific authority showing that Dr. Shuman's medical explanation itself has been undermined.  In fact, the sources cited by Plaintiff appear to be consistent with Dr. Shuman's explanation that the term is being discarded in part because it is ill-defined.  For example, the cited statement from the College of American Pathologists indicates that "excited delirium" should not be used as a medical diagnosis and should not be listed as a cause of death.  Press Release, Coll. of Am. Pathologists, CAP Supports Discontinuing Term "Excited Delirium" as Cause of Death (Oct. 13, 2023), https://newsroom.cap.org/latest-news/cap-supports-discontinuing-term--excited-%20delirium--as-cause-of-death/s/c29dd694-6877-428a-95b4-d5fc5c0d82cc.  But Dr. Shuman did not use "excited delirium" as a diagnosis or cause of death.  Rather, he relied on Mr. Desir's history of psychiatric illness,[5] *see* [DE 165-1] at 2, and listed the cause of death as "anoxic/ischemic encephalopathy due to cardiopulmonary arrest during restraint for acute psychosis," *id.* at 5.  Elsewhere, Dr. Shuman stated in similar fashion that the restraint, in conjunction with Mr. Desir's state, was the cause of death—i.e., "cardiopulmonary arrest during restraint for acute psychosis."  [DE 175-1] at 42.

---

[5] Plaintiff does not seem to challenge Dr. Shuman's characterization of Mr. Desir's medical records.

Plaintiff's cited statement from the American Medical Association ("AMA") similarly describes the problem of using "excited delirium" as an official diagnosis as being that the term has no "clear set of diagnostic criteria"—again consistent with Dr. Shuman's description—and warns against using it as a justification for intervention with sedatives.  Press Release, Am. Med. Ass'n, New AMA Policy Opposes "Excited Delirium" Diagnosis (June 14, 2021), https://www.ama-assn.org/press-center/ama-press-releases/new-ama-policy-opposes-excited-delirium-diagnosis.  However, the AMA's statement does not address the possible consequences of a psychotic episode on brain chemistry or the potential increased risk of cardiac arrythmia.  *See id.*

The position of the American College of Medical Toxicology ("ACMT") that Plaintiff cites takes issue with the term "excited delirium" as being "used in multiple distinct contexts with various underlying causes," including when a person may be intoxicated with psychoactive substances.  Press Release, Am. Coll. of Med. Toxicology, ACMT Position Statement on End the Use of Excited Delirium (May 1, 2023), https://www.acmt.net/news/acmt-position-statement-on-end-the-use-of-excited-delirium/.  Like the other citations, rather than undermine the possibility that Mr. Desir's psychotic state contributed towards cardiopulmonary arrest, as Dr. Shuman opines, the ACMT position urges a shift away from "excited delirium" to different terms, such as "hyperactive delirium with agitation."  *Id.*  In short, the dispute Plaintiff raises appears to be, like Defendants suggest, more one over terminology rather than actual analysis.

At the very least, whatever concerns Plaintiff may legitimately have over the use of the term "excited delirium" do not so undermine the reliability of Dr. Shuman's analysis that it cannot be presented to the jury.  Even assuming that Dr. Shuman's opinion is the minority view in the medical community and not generally accepted, general acceptance is only one factor under

*Daubert. See* 509 U.S. at 588 ("Nothing in the text of . . . Rule [702] establishes 'general acceptance' as an absolute prerequisite to admissibility."); *see also United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (stating that expert testimony failing to meet "all or most" *Daubert* factors can still be admissible); *cf. Kleiman v. Wright*, No. 18-CV-80176, 2020 WL 6729362, at *34 (S.D. Fla. Nov. 16, 2020) ("And the mere fact that Dr. Eggington adheres to a different school of thought regarding [linguistic] forensic analysis does not compel the conclusion that Dr. Leonard's analysis is unreliable or fundamentally flawed."). Moreover, mere disagreement between possible experts is not enough to exclude an expert opinion. *See United States v. Gutierrez*, No. 21-13791, 2023 WL 3620891, at *4 (11th Cir. May 24, 2023). Because Dr. Shuman adequately explains the effects of psychosis on one's brain chemistry and how it interacts with being subjected to restraint and can contribute to negative health consequences, the Court will not exclude Dr. Shuman's opinion and testimony based on a few press releases[6] relating to excited delirium syndrome.

---

[6] The non-binding cases from other district courts that Plaintiff cites do not compel a different conclusion. Plaintiff cites these cases for the proposition that "courts have similarly rejected 'excited delirium' as a medical diagnosis and cause of death . . . ." [DE 165] at 8. Plaintiff's first citation does not even address excited delirium at all. *See generally Berger v. Spokane County*, No. 15-CV-140, 2017 WL 5639939 (E.D. Wash. Jan. 5, 2017). If Plaintiff meant to cite *Estate of Berger v. Spokane County*, No. 15-CV-140, 2017 WL 5639941 (E.D. Wash. June 16, 2017), that case still does not suggest that excited delirium syndrome itself is an unreliable diagnosis. Rather, the Court excluded an expert's testimony because of deficiencies that tainted the particular expert, not the use of excited delirium syndrome as a diagnosis generally. *See id.* at *2. In the other citation, which consists of a court's findings of fact and conclusions of law following a bench trial, the court *found* that the decedent did not experience excited delirium syndrome. *Petro v. Town of W. Warwick ex rel. Moore*, 889 F. Supp. 2d 292, 318 (D.R.I. 2012). It rejected a certain expert's testimony because no sources supported that expert's contention that excited delirium syndrome can arise instantly in response to police involvement when agitation was not present prior. *Id.* at 317. Further, the Court rejected the expert's contention that excited delirium syndrome was not a "diagnosis of exclusion" because that same expert had previously testified that death by excited delirium required a negative autopsy (i.e., an autopsy where there are no other independent indicators of conditions sufficient to cause death), so the diagnostic criteria for excited delirium were not met. *Id.* at 317-18. These cases do not move the needle for Plaintiff, nor do policy

**B.  Helpfulness of Dr. Schultz's and Dr. Shuman's observations from the footage**

Both Plaintiff and Defendants seek to exclude each other's cause-of-death experts from testifying about their observations from the video footage of the incident.  For example, Defendants seek a ruling preventing Dr. Schultz from "commenting upon or interpreting what is factually depicted in the video surveillance footage."  [DE 164] at 2.  Defendants argue that such testimony would be improper because the jury must determine what the footage depicts, and Dr. Schultz's status as an expert may make his characterization of the footage come to the jury with an improper "air of authority."  *Id.* at 5-6.  Plaintiff responds that the proposed testimony about Dr. Schultz's observations of the video evidence is permissible lay witness testimony and not expert testimony, so it should be allowed.[7]  [DE 176] at 2.

On the flipside, Plaintiff's motion argues that the chart in Dr. Shuman's report, which contains "a timeline of assumptions to support his forensic opinions," should be excluded because it "invades the province of the jury by telling it what it should see [on the footage] and when."  [DE 165] at 9.  According to Defendants,[8] Dr. Shuman provides an explanation of the medical

---

decisions in California, Colorado, and Minnesota to create legislation regarding excited delirium syndrome.

[7] The Court is unpersuaded by this argument because Plaintiff explicitly wants Dr. Schultz's testimony on the footage to "give the jury a clear understanding of what they are looking at in the video[,]" as "[m]atters of neck compressions, carotid arteries, and jugular veins are beyond the understanding an experience of the average lay citizen."  [DE 176] at 3.  Admissible lay opinions do not rely on scientific or specialized knowledge, so Plaintiff's distinction ultimately breaks down.  *See* Fed. R. Civ. P. 701(c).

[8] Defendants attempt to explain the seemingly conflicting positions in its briefing on two different motions with this vague statement: "The distinction between forming an opinion based on observations versus forming an opinion on what is being observed is integral . . . ."  [DE 175] at 4 n.4.  That is true, as far as it goes.  However, Defendants do not convincingly explain why Dr.

significance of what he observes on the video (which necessarily requires reference to what he observed) and Dr. Shuman is no less entitled to explain the medical significance of his observations just because video evidence underpins the testimony.  [DE 175] at 10.  Even so, Defendants concede that Dr. Shuman cannot give an opinion on what the correct interpretation of the video footage would be.  *Id.* at n.5.

Some courts have held that an expert's testimony should be excluded or limited where the expert is no better suited than the jury to interpret a video's content.  *E.g.*, *Prosper v. Martin*, 989 F.3d 1242, 1249-50 (11th Cir. 2021) (holding that district court did not abuse its discretion by excluding expert's interpretation of a video as unhelpful because jury could see for themselves that video depicted little more than "gross movements").  In these cases, courts emphasize that "testimony from an expert is not helpful to the jury if it simply states what the expert sees or hears on the recording."  *Harris v. Wingo*, No. 2:18-CV-17-FTM-29MRM, 2021 WL 5028201, at *4 (M.D. Fla. Oct. 29, 2021) (citing *Prosper*, 989 F.3d at 1250); *see also Lee v. Andersen*, 616 F.3d 803, 808-09 (8th Cir. 2010) (affirming exclusion of expert testimony that decedent was not holding firearm because expert interpreted images through "simple observation," and "the jury was entirely capable of analyzing the images and determining whether [decedent] had anything in his hands").  Relatedly, this Court has refused to let an expert give a general overview of a video when that video "speaks for itself."  *Birren v. Royal Caribbean Cruises, LTD.*, No. 20-CV-22783, 2022 WL 446207, at *10 (S.D. Fla. Feb. 14, 2022) ("[Expert] opinions partly relying on the CCTV footage in conjunction with other materials are helpful to the jury and admissible. However, . . . Mr. Hanson will not be permitted to give a general overview of the CCTV footage itself since the

---

Shuman's challenged testimony goes in the former category while Dr. Schultz's belongs in the latter category.

22

CCTV footage speaks for itself." (citation omitted)).  An expert's observations from a video must instead be connected to the specialized knowledge of the expert for it to be helpful to the jury.  *See Jackson v. Catanzariti*, No. 6:12-CV-113, 2019 WL 2098991, at *9-10 (S.D. Ga. May 14, 2019) ("Mr. Atherton does not connect his observations from the handheld video to his corrections experience and expertise such that his proposed testimony would be helpful to the trier of fact.").

The Court concludes here that Dr. Shuman and Dr. Schultz may explain their reliance on the footage and reference the observations they made to formulate their respective conclusions because such testimony does more than just state what is seen.  Indeed, Dr. Shuman and Dr. Schultz are not being presented to the jury solely to construct a factual narrative or simply tell the jury what it should see on the video.  Rather, each is opining on Mr. Desir's cause of death, and the video footage—in conjunction with other materials—helped each expert form or confirm their respective conclusions.  In trying to explain the complicated scientific elements at play in Mr. Desir's death, reliance on the video footage is but one piece of the puzzle.  Preventing either expert from explaining their reliance on the footage generates more of a risk of confusing the jury rather than a risk of prejudicing it.  Additionally, any risk of the jury giving undue weight to either expert's interpretation of the video footage is mitigated by the fact that *both sides* will have a cause-of-death expert doing the same thing.

Still, what Dr. Shuman and Dr. Schultz cannot do is simply give a general overview of the video footage that is untethered from scientific analysis.  Giving such an overview would not be helpful because "it [would] not offer anything the jury could not discern on its own."  *Prosper*, 989 F.3d at 1249.  In that scenario, the video "speaks for itself."  *See Birren*, 2022 WL 446207, at *5-10.  But each expert's opinion, which is partly based on the footage, does not speak for itself, making it admissible.  *See id.* at *5.  Therefore, when it comes to discussing the footage, both

motions will be granted in part and denied in part.  Each expert is free to note and explain their reliance on the footage in forming or confirming their opinions—including what certain observations may mean from a medical cause-of-death standpoint.  Each expert's reference to what they observed on the video should be accompanied by presentation of the video itself.[9]  For example, if Dr. Shuman relies on his chart to explain his observations, he may do so in conjunction with pointing to the spots on the video that support his chart.  If either expert observes that a certain portion of the video shows (or does not show) a defendant's hands on Mr. Desir's neck, the expert can and should point out on the actual video what he sees.  The opposing party is free to cross-examine the expert to attempt to show that the video does not actually show what the expert is describing and attempt to discredit that testimony and reliance on the footage.  To the extent the parties are concerned that the jury will give undue weight to what one of the experts says he sees on the video, rather than relying on their own observations, simply because the testimony comes from someone who is qualified as an expert, the appropriate remedy is for the parties to prepare a joint proposed limiting instruction explaining to the jury that they, not either side's expert, are ultimately responsible for determining what the video footage depicts based on their own observations.

In sum, neither expert can give a mere general overview of their interpretation of the video. However, both experts can identify, in conjunction with the video itself, the particular observations that are connected to their medical analysis.  Further, if one of the parties feels that the testimony

---

[9] It goes without saying that proving the contents of the video footage requires showing the footage to the jury rather than relying on an expert's description of it.  Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.").

is venturing into just a general overview of the video, without any linkage to a medical explanation, those objections are within the discretion of the trial judge.

## III.   AUBREY LAND

Mr. Land is Defendants' use-of-force expert and has over three decades of experience in law enforcement, which includes experience reviewing use-of-force incidents.  [DE 166-1] at 2-3. He intends to offer six opinions in this case.  *See id.* at 6-10.  The first five opinions address whether the force used by the officers at different points was "objectively reasonable."  *Id.* at 6-9.  The last opinion addresses whether specific policies of the Broward Sheriff's Office are "sound policies." *Id.* at 10.  Challenging Mr. Land on the grounds of qualifications, reliability, and helpfulness, Plaintiff asks the Court to exclude Mr. Land's opinions in their entirety (or at least limit his testimony).  [DE 166] at 10.  The Court declines to exclude Mr. Land from testifying entirely, but it will limit the opinions in the ways described below.

### A.  Qualifications

Plaintiff argues that Mr. Land is not qualified because his experience as a corrections officer is "too thin and outdated" and his tenure at the Florida Office of the Inspector General cannot make up for the shortfall.  [DE 166] at 2-3.  Even though Mr. Land's duties at the Inspector General included reviewing use-of-force incidents at correctional facilities, Plaintiff stresses that most of Mr. Land's work at the Inspector General involved investigating white-collar crimes.  *Id.* Defendants respond that Mr. Land has worked in law enforcement and corrections for over three decades, has reviewed numerous use-of-force incidents, and has served as a use-of-force expert in other cases.  [DE 180] at 4-5.

The Court agrees with its sister district and concludes that "Mr. Land is qualified to testify competently regarding corrections officers' practices in this case." *Robinson v. Lambert*, No.

615CV1896ORL22LRH, 2019 WL 7971852, at *4 (M.D. Fla. Dec. 18, 2019) (denying *Daubert* motion to exclude Aubrey Land as expert on use of reasonable force by corrections officers during relevant time).   Even upon an independent review of Mr. Land's qualifications, the Court concludes that Mr. Land is at least "minimally qualified" based on his thirty-plus years of law enforcement experience, which includes investigating multiple instances of excessive force in Florida correctional facilities.  *See Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) ("[S]o long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony, as this relates more to witness credibility and thus the weight of the expert's testimony, than to its admissibility." (citing *Trilink Saw Chain, LLC v. Blount, Inc.,* 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008))), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010); *Feliciano*, 844 F. Supp. 2d at 1262 (quoting *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012)); *see also Ideal Image Dev. Corp. v. Idealaser Hair Removal Corp.*, No. 18-20927-CIV, 2019 WL 13064755, at *1 (S.D. Fla. Aug. 28, 2019) ("An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." (alteration in original) (quoting *J.G. v. Carnival Corp.*, No. 12-21089-CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013))).   Plaintiff's challenges as to the true extent of Mr. Land's experience go toward the weight of the testimony rather than its admissibility, and Plaintiff can cross-examine Mr. Land on that basis.

### B. Reliability

Plaintiff argues that all six of Mr. Land's opinions are "devoid of even the most cursory of analyses" and that admitting his testimony would require the Court to "take Mr. Land's word for it."  [DE 166] at 4.  Regarding the use-of-force analysis, Plaintiff criticizes Mr. Land of failing to identify specific standards beyond the "totality of the circumstances" and glossing over certain

factors. *See, e.g.*, *id.* at 5. Defendants resist Plaintiff's implied suggestion that a specific standard exists for each aspect of a use-of-force analysis beyond the totality of the circumstances, instead stating that Mr. Land's methodology of looking to the totality of the circumstances is acceptable under prevailing standards. [DE 180] at 6. As support, Defendants rely on Mr. Land's testimony indicating that the appropriate standard is the totality of the circumstances and that there would be no way to write a more specific standard for each situation that could possibly occur. *Id.* at 6-7. According to Defendants, Mr. Land also properly identified and applied numerous factors in his deposition that inform the totality of the circumstances analysis. *Id.*

The Court concludes that Mr. Land's testimony is sufficiently reliable to be admissible. Mr. Land testified that he relied on the totality of the circumstances. *See, e.g.*, [DE 180-1] at 51-53. According to Mr. Land, analyzing the totality of the circumstances is consistent with the industry standards incorporated by the American Correctional Association's standards and the Florida Model Jail Standards. *Id.* at 55-59. Mr. Land also explained that his knowledge of the prevailing standards is supported by his own training and experience. *Id.* at 50. Further, when assessing this case under the totality-of-the-circumstances standard, Mr. Land testified about multiple factors that would help inform the inquiry, including whether force was necessary to accomplish a lawful objective and whether the officers did anything to prevent using force and deescalate the scenario beforehand. *Id.* at 50-51. Regarding the actual amount of force used, Mr. Land explained that the officers can use force to accomplish a set objective, but the amount used to respond to someone resisting is not any level of force or force that is deadly or could cause great bodily harm. *Id.* at 120-21, 124-25. Because Mr. Land's testimony highlights multiple factors under the totality-of-the-circumstances standard (which Mr. Land identifies as the prevailing

standard in the industry) and connects those factors to facts with some support in the record, the Court will not exclude the testimony entirely on the basis of reliability.

Even so, Defendants do not substantively address Plaintiff's arguments as to Mr. Land's sixth opinion.  *See* [DE 166] at 8 (arguing that it "lacks adequate analysis and is thus unreliable"). Mr. Land's sixth opinion is that certain polices, including the Broward Sheriff's Office's use-of-force, pepper spray, restraint chair, and taser/stun gun polices, are "sound."  [DE 166-1] at 10.  At his deposition, Mr. Land testified that the American Correctional Association's standards and the Florida Model Jail Standards are "incorporated into the policies, procedures, and the training practices of the BSO."  [DE 180-1] at 58.  Mr. Land also testified that these sources discuss "utilizing good correctional judgment," "using de-escalation techniques," and "formalizing a plan and knowing how . . . to try and move forward."  *Id.* at 55-56.  Accordingly, Mr. Land's testimony on his sixth opinion will be limited to describing how the policies he enumerates comply with the American Correctional Association's standards and the Florida Model Jail Standards—as well as how those standards compare to his own experience.

### C.  Helpfulness

Plaintiff argues that the first five opinions of Mr. Land "plainly invade the province of the jury by concluding Defendants' actions were 'objectively reasonable.'"  [DE 166] at 9.  Defendants respond that Mr. Land's opinions are properly about prevailing standards in the field of law enforcement rather than mere legal conclusions.  [DE 180] at 7-8.

In the use-of-force context, the jury must make the ultimate determination of whether an officer's use of force was reasonable.  *See, e.g.*, *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990).  Expert testimony on use of force is not helpful if it simply tells the jury what result to reach.  *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)

(citing Fed. R. Evid. 704 advisory committee's note); *Chappell v. Carnival Corp.*, 666 F. Supp. 3d 1316, 1322 (S.D. Fla. 2023) (quoting *Umana-Fowler*, 49 F. Supp. 3d at 1122).  Accordingly, the Eleventh Circuit has explained that expert testimony opining explicitly on the reasonableness of an officer's actions tends to "invade the province of the jury." *Samples*, 916 F.2d at 1551.

Nonetheless, "an expert witness can testify as to the prevailing standards in the field of law enforcement." *United States v. Myers*, 972 F.2d 1566, 1577 (11th Cir. 1992) (citing *id.*).  An expert may also testify about supposed compliance or noncompliance with prevailing standards. *See Samples*, 916 F.2d at 1551-52; *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). This testimony may include the factors that officers should consider in similar situations. *See, e.g.*, *Jackson*, 2019 WL 2098991, at \*11 ("Mr. Atherton may opine on the factors relevant to hypothetical uses of force, and he may be asked appropriate hypotheticals based on the evidence adduced at trial.").

Further, testimony from a use-of-force expert is not categorically excludable just because police standards are intertwined with the legal standard at issue.  *See Sears v. Rivero*, No. 19-13668, 2022 WL 2291220, at \*5 (11th Cir. June 24, 2022) ("The witness does not invade the province of the jury when his testimony addresses whether force was reasonable or justified if that testimony is about prevailing standards in the field of law enforcement." (citation modified)); *Jimenez*, 732 F.3d at 721 ("When an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is 'limited to describing sound professional standards and identifying departures from them.'" (quoting *West v. Waymire*, 114 F.3d 646, 652 (7th Cir.1997)); *see also* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue.").

The Eleventh Circuit helped clarify these limits on use-of-force expert testimony in *Samples*. *See* 916 F.2d at 1551-52.  There, the plaintiffs appealed after an unfavorable jury verdict, arguing that the district court erred in admitting the testimony of the defendants' use-of-force expert.  *Id.* at 1551.  At trial, defense counsel had asked the expert "whether or not it was reasonable for the officer to discharge his firearm when David Samples charged him with a knife."  *Id.*  The expert answered that, in his opinion, the officer acted reasonably.  *Id.*  The Eleventh Circuit explained that "the literal wording of the question posed tends to call for an answer that would invade the province of the jury, which in this case was to decide the reasonableness of the officer's actions."  *Id.*  However, the Eleventh Circuit affirmed anyway because "the questions leading up to this testimony, and the manner in which the expert answered the question, properly informed the jury that the expert was testifying regarding prevailing standards in the field of law enforcement."  *Id.*  The question was properly based on a hypothetical from the facts in evidence and framed regarding industry standards, where the expert applied a three-pronged analysis to address the use of force.  *Id.*; *cf. Myers*, 972 F.2d at 1577-78 (11th Cir. 1992) (holding that district court did not err in allowing testimony of lay witness police officer that force was "unjustified" because witness "properly framed his opinion in accordance with prevailing police standards"); *Sears*, 2022 WL 2291220, at *5 ("Pacchioli's testimony was properly framed in accordance with the Inspector General's standards for use of force incidents.").

Here, five of the six[10] opinions offered by Mr. Land are stated in terms of whether the actions of certain officers were "objectively reasonable."  *See, e.g.*, [DE 166-1] at 6 ("The force used by BSO deputies was objectively reasonable under the totality of the circumstances.").  Standing alone, general statements that officers' actions were "objectively reasonable" would

---

[10] Plaintiff does not appear to challenge the helpfulness of the sixth opinion.  *See* [DE 166] at 8-10.

appear to "invade the province of the jury" by offering unsupported conclusions regarding the very thing that the jury is responsible for deciding: the reasonableness of the officers' actions. *Samples*, 916 F.2d at 1551. Mr. Land's testimony thus cannot be introduced without a proper foundation that frames the opinions for the jury in terms of the prevailing use-of-force standards. *See id.* at 1551-52.

But Mr. Land did frame his opinions in terms of the prevailing standards in the field of law enforcement. Mr. Land relied on the American Correctional Association's standards and the Florida Model Jail Standards. [DE 180-1] at 44, 50. Both, according to Mr. Land, are incorporated into the Broward Sheriff's Office's policies. [DE 180-1] at 58. Using these standards, he explained in his deposition that the use-of-force analysis is commonly governed by the "totality of circumstances" rather than specific standards for each situation. [DE 180-1] at 51-52. The broader focus on the totality of circumstances, according to Mr. Land, is because there would be no way to write down a specific standard for every possible use-of-force scenario that could occur. *Id.* at 56, 80. Mr. Land explained that officers are generally supposed to try and deescalate the situation and gain compliance after assessing the available facts. *Id.* at 54-55, 58-59. When a subject is resisting a lawful objective, Mr. Land testified that "a reasonable amount of force to accomplish the set objective is what [officers are] governed by." *Id.* at 120. Mr. Land also testified that an officer could continue to use force until compliance is achieved, but the force permitted when a subject is merely resisting is not deadly force or force that can cause serious bodily harm. *Id.* at 124-25. Throughout his deposition, Mr. Land even identified certain factors that would affect the "totality of the circumstances" analysis, such as whether the force was necessary, whether the officer did anything to prevent the need to use force, whether the officer did anything to deescalate the situation, and whether the amount of force used was justified. *See, e.g.*, *id.* at 50-51.

Consequently, Mr. Land's first five opinions—which are framed in terms of whether actions were "objectively reasonable"—are admissible unless defense counsel fails at trial to lay a foundation that frames these opinions "in the context of the prevailing standards of police behavior." *Myers*, 972 F.2d at 1578 (11th Cir. 1992). In other words, if the foundation laid makes it clear to the jury that Mr. Land's testimony relates to general police standards for the use of force in detention facilities and not the ultimate legal question for the panel, Mr. Land may discuss the totality-of-the-circumstances inquiry, identify relevant factors that officers would normally consider, and answer hypotheticals posed to him. Because of the apparent overlap between the application of the supposed industry standards and the jury question, the ultimate determination of whether particular questions to Mr. Land call for an objectionable answer will be left up to the discretion of the trial judge based on how the trial proceeds.

Plaintiff also challenges Mr. Land's interpretations of the video footage, arguing that the jury is fully capable of determining what the videos depict. [DE 166] at 9-10. Defendants do not substantively address this argument beyond noting that, during the deposition, there were "some improper invitations to Mr. Land to provide opinion testimony interpreting what is depicted in the footage." [DE 180] at 5. Without an active effort to connect Mr. Land's observations from the video footage to his specialized knowledge, the Court cannot conclude that Defendants met their burden of establishing that testimony from Mr. Land on what is factually depicted in the video footage would be helpful to the jury. *See Jackson*, 2019 WL 2098991, at *9-10. Accordingly, unlike the cause-of-death experts, who can connect their observations from the videos to important aspects of their medical analysis, Mr. Land will not be allowed to testify regarding his observations from the video footage because the jury is more than capable of determining whether the video shows things like Mr. Desir resisting without provocation. Even so, the Court emphasizes that Mr.

Land will still be allowed to provide general testimony on the prevailing standards for use of force, which can include answering hypotheticals based on facts in evidence.

## IV.   PATRICK HURLEY

Mr. Hurley is Plaintiff's correctional practices and use-of-force expert. *See* [DE 163-1] at 1. He has around forty years of experience in adult and juvenile corrections. *Id.* Plaintiff engaged Mr. Hurley to render an opinion on "whether Mr. Desir was denied access to adequate medical and mental health care" and "subjected to excessive force" that resulted in Mr. Desir's death. *Id.* Mr. Hurley authored an eighty-two-page report and gave deposition testimony. To form his opinions, he relied on his "education, training, and experience." *Id.* at 4. He also relied on other sources, such as articles, policies, and standards used or written by different people or organizations. *See generally id.* The report details the ways in which the actions of the jail staff, including law enforcement officials, contributed to the escalating use of force that, according to Mr. Hurley, caused Mr. Desir's death in the way described by Dr. Schultz in his autopsy report. *See id.* at 80-81. Mr. Hurley details numerous alternatives throughout his report and deposition testimony that would have been preferred. For example, Mr. Hurley's report states that "[t]here were other options which could have been used and other techniques which could have changed the outcome of this event." *Id.* at 80. Defendants, however, seek an order excluding the opinions and proposed testimony of Mr. Hurley. [DE 163] at 2.

### A. Qualifications

Defendants do not appear to challenge Mr. Hurley's qualifications, *see* [DE 163] at 7-10, and the Court separately concludes that Mr. Hurley is qualified to testify regarding correctional practices, which includes testimony on the prevailing standards on use of force, based on his approximately forty-year career in law enforcement. His curriculum vitae indicates he has

reviewed thousands of use-of-force incidents as well as trained officers on correctional practices, among other things.

### B. Reliability

Defendants make five arguments, three of which challenge the reliability of Mr. Hurley's methodology.  *See* [DE 163] at 7-10.  First, Defendants argue that the opinions are not the product of reliable principles or methods because they rely on an "ipse-dixit because-I-said-so approach." *Id.* at 7.  Second, Defendants argue that Mr. Hurley's opinions are overly speculative, and so he should not be allowed to testify as to what "may" have occurred, what "could have resulted," and "what Mr. Desir could have been thinking." *Id.* at 8-9.  Third, Defendants argue that Mr. Hurley's opinions are unreliable because they are internally inconsistent. *Id.* at 9.  The Court disagrees with all three of these reliability arguments.

The first reliability argument—that Mr. Hurley's opinions are unreliable for being of the because-I-said-so variety—is entirely unpersuasive.  Although "an expert cannot rely on 'experience' without explaining in detail how the experience and other materials consulted support the opinion rendered[,]" *Umana-Fowler*, 49 F. Supp. 3d at 1122 (citing *Frazier*, 387 F.3d at 1265), Mr. Hurley repeatedly connects his experience to other sources and ultimately to his opinions in the case throughout his eighty-two-page report, *see, e.g.*, [DE 163-1] at 4-7 (describing "common practice" of routinely checking on and recording information about people when they are placed in a cell for observation and then assessing record evidence in the case, including with citations to outside authorities); *id.* at 15-18 (citing outside authorities for "foundation" of use-of-force analysis, then explaining Mr. Hurley's own experience with use of force, and then transitioning into an application of those principles to record evidence in this case); *id.* at 18 (noting how "[r]obust training in the correctional setting" will include having staff consider "flight/fight/freeze"

responses by inmates, adjust their approach, and try to communicate with the inmate—standards which Mr. Hurley then applies to an officer's actions toward Mr. Desir); *id.* at 20 (describing "Snowball Effect" that Mr. Hurley uses to train officers on how an officer failing to recognize a "flight/freeze or flight" response can lead to escalating uses of force that "spiral out of control" and applying concept to an officer's actions toward Mr. Desir); *id.* at 41 ("[T]he hand placement on the back of Mr. Desir's neck was a possible trigger point and should have been avoided. I know of no defensive tactics or escort tactics which begin with a deputy's hand placement on the back of inmate's neck.").

As Plaintiff points out, Mr. Hurley's deposition testimony also adequately connects his experience and training to his opinions. *See, e.g.*, [DE 163-2] at 25 ("No, there is no specific standard that says it needs to take five minutes, 10 minutes or those parameters that I'm aware of. In my experience it's not going to be 10 seconds or 30 seconds."); *id.* at 28 ("In the negotiation trainings that I've received and taught when you introduce new negotiators one right after the other it's like turning your computer on and off or pushing the restart button repeatedly. It can set de-escalation back rather than moving it forward."); *id.* at 42 ("[P]lacement on the back of the neck is not a common escort technique. It's not trained anywhere that I know of nor according to the testimony of the deputies they were not trained to do that either."); *id.* at 51 ("And it's pretty common in corrections training, law enforcement training that techniques associated with hand placement, arm placement in those areas are reserved for only those times when somebody's life is in danger or of imminent serious harm or death."). Simply put, "[Mr. Hurley's] testimony is not of the 'I'm an expert, just trust me' variety." *Flint v. Scott*, No. 16-CV-159, 2018 WL 327166, at *2 (M.D. Ga. Jan. 8, 2018).

The second reliability argument—that Mr. Hurley's opinions are speculative, and he should not be allowed to testify as to what "may" have occurred, what "could have resulted," and "what Mr. Desir could have been thinking"—is likewise unpersuasive to the Court.  What may have occurred and could have resulted are hypotheticals.  Expert witnesses can answer hypothetical questions or discuss hypothetical scenarios without the testimony becoming impermissible speculation. *See United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) ("The ability to answer hypothetical questions is the essential difference between expert and lay witnesses." (citation modified)); *Jackson*, 2019 WL 2098991, at *11 ("Mr. Atherton may opine on the factors relevant to hypothetical uses of force, and he may be asked appropriate hypotheticals based on the evidence adduced at trial.").  Regarding the supposed speculation about "what Mr. Desir could have been thinking," Plaintiff is right that Mr. Hurley can discuss the observations a reasonable officer would make under prevailing standards based on what was observed, even if Mr. Hurley could not reliably testify as to what Mr. Desir was actually thinking.

For Defendants' third reliability argument, which asserts that Mr. Hurley's opinions are internally inconsistent and thus unreliable, the Court is unconvinced.  Although Defendants assert that Mr. Hurley "willfully chooses to selectively ignore certain materials," [DE 163] at 9, "[a]n expert is . . . permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded to that opinion is for the jury." *Feliciano*, 844 F. Supp. 2d at 1265 (alteration in original) (quoting *Walker*, 46 F. App'x at 695-96).  Reviewing the report and testimony as a whole, rather than through cherry-picked instances, the opinions are not conflicted enough to make them totally inadmissible.  Mr. Hurley's testimony is instead sufficiently reliable and thus the Court will not exclude his testimony on this basis.

### C.  Helpfulness

Defendants make two arguments that generally relate to helpfulness.  *See* [DE 163] at 7-8, 9-10.  Defendants' first argument is that Mr. Hurley's opinions are inadmissible legal conclusions.  *Id.* at 7-8.  Defendants next argue that Mr. Hurley cannot be a conduit for hearsay statements or other opinion testimony.  *Id.* at 9-10.  The Court addresses each argument in turn.

Regarding the first argument, Defendants contend that "expert testimony disputing the 'existence of arguably superior alternatives' is not admissible in a confinement setting."  *Id.* at 8 (quoting *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999)).  *Campbell* itself was quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986).  Both cases dealt with excessive-force claims under the Eighth Amendment, which have a more stringent standard than the excessive-force claims under the Fourteenth Amendment in this case.  *See Campbell*, 169 F.3d at 1374 ("[I]n *Whitley*, the Supreme Court reiterated that force does not violate the Eighth Amendment merely because it is unreasonable or unnecessary."); *see also Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990) (addressing Eighth Amendment excessive-force claim under *Whitley*'s "unnecessary and wanton infliction of pain" standard).  Although "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives" would not be determinative in an Eighth Amendment claim, *Whitley*, 475 U.S. at 322, reasonableness is the crux of the question for the jury here in the claims brought under the Fourteenth Amendment, *see Myrick v. Fulton County*, 69 F.4th 1277, 1301 (11th Cir. 2023) ("If an officer used objectively unreasonable force, he or she violated a detainee's Fourteenth Amendment rights."); *Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015).  Defendants' argument that Mr. Hurley cannot testify as to better methods fails.

Additionally, to the extent Defendants suggest that offering testimony on alternatives is not helpful to the jury because it does not actually show whether force was excessive, Mr. Hurley explained during his deposition, "When there's other options that would have been effective to gain control, could have been used and weren't used I see it [the force] as that [excessive]." [DE 163-2] at 43. And, as explained in the analysis of Mr. Land, experts can testify regarding the prevailing standards in law enforcement, along with deviations from those standards and factors that officers should consider in similar situations. Therefore, as long as a proper foundation can be laid to indicate that Mr. Hurley is testifying about conformance (or a lack thereof) with prevailing standards, his testimony is not excludable as mere legal conclusions. *See Samples*, 916 F.2d at 1551-52. The ultimate decision rests within the trial judge's discretion.

By contrast, the second helpfulness argument aimed at Mr. Hurley—that he cannot serve as a conduit for hearsay or other opinion testimony—gains some traction. However, most of what Defendants write for this argument is paraphrased or quoted caselaw and citations without substantive analysis. *See* [DE 163] at 9-10. The only real argument is that "[Mr.] Hurley may not testify about the opinions of Plaintiff's pathologist expert, Dr. Schultz." *Id.* at 9. As it relates to one expert referencing another expert's opinions, an expert may rely on the opinions of other experts but may not "merely regurgitate" or "parrot" their opinions without independent verification. *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts, such expert must make some findings and not merely regurgitate another expert's opinion." (citation modified)); *La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, 586 F. Supp. 3d 1300, 1304, 1306 (S.D. Fla. 2022); *Hendrix*, 255 F.R.D. at 607 n.75; *see also Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions

ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not.").

Accordingly, Defendants are right that Mr. Hurley may not simply restate Dr. Schultz's medical opinion that manual strangulation was Mr. Desir's cause of death. Moreover, Mr. Hurley cannot offer a medical opinion on the effects of manual strangulation on the body because he is not a medical expert. *See La Gorce Palace*, 586 F. Supp. 3d at 1308 ("[T]he expert may testify only about matters within the scope of the person's expertise."). Even so, Mr. Hurley is still free to discuss prevailing standards in the field of law enforcement, which includes (but is not limited to) testimony that (1) explains how techniques involving hand placement around the neck and other high-risk areas are reserved for very rare circumstances; and (2) lists the observational factors regarding an inmate's apparent condition that would inform a reasonable officer's decision-making. The motion directed at Mr. Hurley will thus be granted in part.

## V.    DR. DAVID MACPHERSON

Dr. Macpherson is an economist. *See* [DE 162-1] at 2-3; [DE 162-2] at 5-6; [DE 177-2] at 8-9. Plaintiff intends to offer Dr. Macpherson's opinion on the present value of the lost economic support and household services of Mr. Desir to his daughters from when he died to when both daughters reach age eighteen. [DE 177] at 2-3; [DE 162-2] at 25, 50-51. According to Plaintiff, the loss of financial support in Dr. Macpherson's calculations is separate from the financial support received in the form of government benefits. [DE 177] at 4-5. Dr. Macpherson does not intend to offer an exact figure on the dollar amount of the lost support to Mr. Desir's daughters annually. [DE 162-2] at 37-39. Likewise, Dr. Macpherson does not intend to offer an exact figure on the time Mr. Desir spent performing household services for his daughters weekly. *Id.* at 31-34. Dr. Macpherson instead intends to provide the jury with a "tool," "benchmark," or "formula" that

would enable the jury to calculate the damages amount for the lost support and services based on the record evidence received at trial.  *E.g.*, *id.* at 31-33, 35-38.

Dr. Macpherson relied on deposition testimony of Mr. Desir's two daughters and Mr. Desir's ex-wife to glean that Mr. Desir had provided financial support and household or other services to his daughters before he died.  [DE 162-2] at 28-31, 48.  The testimony contains indications that some of the support or services provided by Mr. Desir included things like cooking, [DE 177-5] at 24-25, shopping, *id* at 24; [DE 177-4] at 23, sending money for things, [DE 177-4] at 48, spending time and giving life advice, *id.* at 23-24, 46-48, helping with homework, *id.* at 46-47, and generally providing what his children needed, [DE 177-3] at 54-55.

Regarding the value of lost financial support, Dr. Macpherson calculated the present value of that lost support based on a factor for every $1,000 lost in a single year.  [DE 162-1] at 6-7.  To inform his analysis, Dr. Macpherson relied on, among other things, the consumer price index projections from the Congressional Budget Office and the zero-coupon U.S. Treasury bond rate for each year of damages from the Board of Governors of the Federal Reserve System.  [DE 162-1] at 7.  These figures helped him calculate the present value by accounting for the effects of inflation and interest rates.  [DE 162-2] at 54.  At the time of his report, Dr. Macpherson's calculations indicated that the present value of lost economic support to Mr. Desir's daughters was $8,861 for every $1,000 lost annually because of Mr. Desir's death.  [DE 162-2] at 8.  According to Dr. Macpherson, the jury can adjust the figure up or down based on the amount of financial support found in the trial evidence.  [DE 162-2] at 39.  For example, if the jury finds that Mr. Desir provided his daughters with $2,000 worth of financial support annually, then the jury could double Dr. Macpherson's figure.  [DE 162-1] at 6-7.

For the value of lost services, Dr. Macpherson calculated the present value of the services Mr. Desir allegedly provided to his daughters based on a factor for every hour of services lost in an average week, enabling a jury to plug in the number of hours the jury finds Mr. Desir normally spent doing these types of tasks for his daughters per week to get the present value of the loss of those services. [DE 162-2] at 32-33. Like the calculations for the loss of financial support, a jury could adjust the one-hour-per-week figure up or down based on what the trial evidence supports. *Id.*; [DE 162-1] at 8. Dr. Macpherson explained that he used a conservative figure from the Bureau of Labor Statistics for the average wage rate for general housekeeping and maid services in the South Florida area for the rate at which to value a variety of household services (e.g., cooking, childcare, and tutoring). [DE 162-2] at 55-57. Dr. Macpherson did not recall reviewing any evidence showing that Mr. Desir provided housecleaning services. *Id.* at 33. According to Dr. Macpherson, this figure still represents the compensation rate for services roughly of the type that Mr. Desir was performing for his daughters, *id.* at 33-35, 64-65, and his figure is meant to be conservative (explaining that the rate is similar to minimum wage in Florida by 2026), *id.* at 59-60. Dr. Macpherson assumed that the rate for many of these services would not vary significantly from the low wage rate for maid and housekeeping services. *Id.* at 55-57. Further, Dr. Macpherson testified that the fact that the daughters moved out of South Florida after Mr. Desir's passing does not affect the methodology because the jury could just adjust the figure up or down based on what the evidence supports. *Id.* at 52. At his deposition, Dr. Macpherson indicated that this methodology was standard for other economists in his field where the exact number of hours of services provided are unknown at the time. *Id.* at 66.

Defendants argue that Dr. Macpherson's opinions and conclusions should be excluded because they are not based on sufficient facts or data and are not the product of reliable principles

or methods.[11]  [DE 162] at 5-8.  On the first point, Defendants assert that Dr. Macpherson did not

rely on enough specific facts from the case and at times relies on facts that are irrefutably to the

contrary.  *Id.* at 6-7.  As to the second point, Defendants describe Dr. Macpherson's supposedly

deficient methodology as the following: "All he did was look up the average wages of a maid in

the Miami area and ascribed [sic] that value to every potential service Mr. Desir hypothetically

could've/would've been providing to his daughters now living in Central Florida for an arbitrary

one hour a week."  *Id.* at 7.  Defendants also cite a prior case in which a district court excluded or

limited the testimony of Dr. Macpherson, which was affirmed by an unpublished Eleventh Circuit

opinion holding that said court did not abuse its discretion.[12]  [DE 162] at 6.  Plaintiff responds

that Dr. Macpherson's opinions are based on sufficient facts and data, a reliable methodology, and

should not be excluded just because Dr. Macpherson's opinions were previously excluded in a

case dealing with the probability of receiving a promotion (rather than with a loss of support and

services for wrongful death or injury).  [DE 177] at 3-9.

### A.  Reliability

Dr. Macpherson's opinions and conclusions are sufficiently reliable to be admissible.  As

Dr. Macpherson continuously repeated throughout his deposition, he is essentially providing a tool

---

[11] Defendants do not appear to challenge Dr. Macpherson's qualifications.  *But see* [DE 162] at 6 ("Notably, Dr. Macpherson has already been found to be *unqualified* to give expert testimony in this circuit . . . ." (emphasis added)).  The arguments by Defendants more naturally fall under the reliability and helpfulness prongs.  Regardless, the Court deems Dr. Macpherson qualified to give economic expert testimony on lost economic support and services based on his curriculum vitae and deposition testimony, both of which detail his prior recognitions, writings, jobs, and decades experience in economics and as an expert witness.

[12] *See Martin v. City of Atlanta*, No. 07-CV-326, 2013 WL 12321961, at *7 (N.D. Ga. May 29, 2013) (excluding testimony of Dr. Macpherson regarding whether race affected employment promotions), *aff'd*, 579 F. App'x 819, 826-27 (11th Cir. 2014) ("Given the highly deferential standard in reviewing decisions to exclude expert testimony under *Daubert*, Appellants have not shown that the judge abused his discretion by excluding Dr. Macpherson's testimony.").

or formula to aid the jury with its computation of damages by providing the present value for lost financial support and household services.  He explicitly is not opining on the exact amount of money Mr. Desir would have provided to his daughters or the exact amount of time that Mr. Desir would have spent performing certain services for them.  Instead, the placeholder figures that Dr. Macpherson provides for the present value of support and amount of time spent on services can be adjusted by the jury based on what the trial evidence shows.

Dr. Macpherson's opinions are based on sufficient facts.  He bases the placeholder figures off record evidence that Mr. Desir provided some degree of financial support to his daughters and would also perform certain caregiving services for them.  The opinions and conclusions are not inadmissible purely because the basis for the opinion aligns with Plaintiff's view of the facts.  *See Feliciano*, 844 F. Supp. 2d at 1265 (quoting *Walker*, 46 F. App'x at 695-96).  Notably, Plaintiff will still need to prove that Mr. Desir actually provided support (outside of government benefits) and other caregiving services—including *how much* support and services were entailed.  *See, e.g.*, *Ortiz v. Wiwi*, No. 11-CV-033, 2012 WL 4482367, at *4-5 (M.D. Ga. Sept. 26, 2012) ("Dr. Poindexter's report in no way serves as evidence that Plaintiff *actually* lost the projected amount of lost earnings and home services.  To establish that Dr. Poindexter's report carries any weight, Plaintiff must establish a loss of earning capacity and home services consistent with that relied upon by Dr. Poindexter.").  But Dr. Macpherson's conclusion that Mr. Desir provided *some* such support and services, justifying providing the jury with a method for valuing the support and services, finds some backing in the record.  *See, e.g.*, [DE 162-3] at 51-52 (detailing support provided by Mr. Desir, including financial support).

Moreover, Defendants' issue with Dr. Macpherson's use of the wage rate for those performing housecleaning and maid services in South Florida goes toward the weight of the

testimony rather than its admissibility.  Dr. Macpherson essentially explained his usage of this wage rate as an attempt to pick a conservative, low-wage occupation that comparably covers services of the general type that record evidence indicates Mr. Desir was performing for his daughters—in the place where he was performing them.  The fact that a housecleaning and maid service occupation may not completely match all the services that a caregiving figure may perform for their children does not leave such a large analytical gap in the proposed expert testimony that it becomes inadmissible, especially considering the overlap between the types of services, the conservative nature of the wage rate, and the difficulty in qualifying certain intangibles provided by a caregiver.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (permitting courts to use discretion when excluding experts based on "an analytical gap").

Plus, as Dr. Macpherson explained, the wage rate for the housecleaning and maid occupation would not be much above the 2026 minimum wage in Florida, which could apply to many different jobs.  *Cf. Ortiz*, 2012 WL 4482367, at *4-5 (concluding that economist's opinions on present value of decedent's lost future earnings and loss of services in the home were reliable partly because his opinions were "very conservative, as his projections [were] based on Decedent making a maximum $10 an hour, no matter the job").  At any rate, the proper way for Defendants to attack Dr. Macpherson's inputs and estimates is through cross-examination and argument, not through excluding the testimony in its entirety. Dr. Macpherson's analysis is sufficiently reliable to be admissible.[13]

---

[13] The Court is unpersuaded by Defendants' citation to *Martin*, where another district court excluded Dr. Macpherson's testimony, because it did not at all involve the calculation of the present value of lost financial support or household services.  *See generally* 2013 WL 12321961.

### B. Helpfulness

The Court concludes that Dr. Macpherson's proposed testimony satisfies the helpfulness prong because it could make it easier for the jury to determine part of the potential damages to award, if any.  In other words, if the jury credits Dr. Macpherson's testimony, it helps the panel by simplifying the calculations needed during deliberations.  Although savvy jurors could potentially do similar calculations without Dr. Macpherson's help, his methodology and sources are likely to be "beyond the understanding of the average lay person." *Ortiz*, 2012 WL 4482367, at *5 (quoting *Frazier*, 387 F.3d at 1262).  Moreover, the testimony would be particularly helpful for the alleged loss of household services because these services are difficult to quantify.  According to Dr. Macpherson, if the jury used his approach for calculating the damages for a loss of household services, "the only thing the jury has to decide is how many hours per week [Mr. Desir] was providing [of services]." [DE 162-2] at 33.  In short, if the jury chooses to credit Dr. Macpherson's expert testimony, it can assist the panel in making certain damages calculations.  Dr. Macpherson's opinions and conclusions thus satisfy the *Daubert* standard and are admissible.  Defendants motion on this issue will be denied.

### CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that:

1.     Defendants' Motion to Strike Plaintiff's Rebuttal Expert or Limit Testimony [DE 122] is **DENIED**.

2.     Defendants' Daubert Motion to Exclude the Opinions and Expected Expert Testimony of Dr. David Macpherson [DE 162] is **DENIED**.

3.     Defendants' Daubert Motion to Exclude the Opinions and Expected Expert Testimony of Patrick Hurley [DE 163] is **GRANTED IN PART** and **DENIED IN PART**.  Mr.

Hurley may testify as long as a proper foundation can be laid to indicate that Mr. Hurley is testifying about conformance (or a lack thereof) with prevailing police standards and not the ultimate question for the jury.  Even so, Mr. Hurley may not simply restate Dr. Schultz's medical opinion that manual strangulation was Mr. Desir's cause of death.  Moreover, Mr. Hurley cannot offer a medical opinion on the effects of manual strangulation on the body because he is not a medical expert.

4.     Defendants' Daubert Motion to Limit and Exclude the Opinion and Expected Expert Testimony of Dr. Daniel Schultz [DE 164] is **GRANTED IN PART** and **DENIED IN PART**.  Although Dr. Schultz may not give a mere general overview of his interpretation of the video footage, he may identify, in conjunction with the video footage itself, the particular observations that are connected to his medical analysis.

5.     Plaintiff's Motion to Exclude the Testimony and Report of Defendants' Expert Mark Shuman [DE 165] is **GRANTED IN PART** and **DENIED IN PART**.  Although Dr. Shuman may not give a mere general overview of his interpretation of the video footage, he may identify, in conjunction with the video footage itself, the particular observations that are connected to his medical analysis.  Dr. Shuman also cannot testify as to when Mr. Desir lost a pulse because his analysis on this point lacks adequate support in the record.

6.     Plaintiff's Motion to Exclude the Testimony and Report of Defendants' Expert Aubrey Land [DE 166] is **GRANTED IN PART** and **DENIED IN PART**.  Mr. Land's first five opinions, which address whether certain actions of law enforcement personnel were "objectively reasonable," are admissible so long as defense counsel lays a foundation that frames these opinions in the context of the prevailing standards of police behavior and not the question for the jury.  Mr. Land's testimony on his sixth opinion (that certain policies are "sound") will be limited to

describing how the policies he enumerates comply with the American Correctional Association's standards and the Florida Model Jail Standards—as well as how those standards compare to his own experience.  In addition, unlike the cause-of-death experts, Mr. Land will not be allowed to testify regarding his observations from the video footage because the jury is more than capable of determining whether the video shows things like Mr. Desir resisting without provocation.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 19th day of December 2025.

Jared M. Strauss
United States Magistrate Judge